IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| ROBINETTE KELLEY,<br>    Plaintiff,<br><br>v.<br><br>IOWA STATE UNIVERSITY OF<br>SCIENCE AND TECHNOLOGY,<br>    Defendant. | 4:17 CV 397<br><br>**DEFENDANT'S NOTICE OF<br>REMOVAL**<br><br>**(ORIGINAL JURISDICTION)** |

Per 28 U.S.C. §§ 1331, 1441, and 1446, Defendant Iowa State University of Science and Technology notifies and petitions the Court for removal of the underlying cause of action filed in the District Court of Iowa for Polk County, stating as follows:

1.      Iowa State University is named as a defendant in a civil action brought in the District Court of Iowa for Polk County entitled "Robinette Kelley v. Iowa State University of Science and Technology," Case No. LACL139210. A copy of the Petition and Certificate of Service is attached and constitutes all process, pleadings, and orders served on Defendant to date in this action. 28 U.S.C. § 1446(a).

2.      Defendant received and accepted service of process on October 31, 2017. This Notice of Removal is timely filed. 28 U.S.C. § 1446(b)(1).

3.      This Court has original jurisdiction in this civil action under 28 U.S.C. § 1331 because the Plaintiff brings claims under laws of the United States, namely, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

4.      This action is pending in the District Court of Iowa for Polk County and may be removed to this Court by Defendant per 28 U.S.C. §§ 1441 and 1446.

5.      Per Local Rule 81(a), Defendant has filed a removal list with this Notice of Removal addressing the requirements of Local Rule 81(a)(1)-(3).

Defendant prays that this cause proceed in this Court as an action properly removed.

Respectfully submitted,

**THOMAS J. MILLER**
Attorney General of Iowa

**/s/ NATASHA N. WILSON**
**NATASHA N. WILSON**
Assistant Attorney General
Hoover Building, Second Floor
Des Moines, Iowa  50319
PHONE:  (515) 725-0501
FAX:  (515) 281-7219
E-MAIL:  natasha.wilson@iowa.gov
ATTORNEYS FOR DEFENDANTS

*Original filed electronically.*
*Copy electronically served on all parties of record.*

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon each of the persons identified as receiving a copy by delivery in the following manner on November 8, 2017:

☐ U.S. Mail            ☐ FAX
☐ Hand Delivery        ☐ Overnight Courier
☐ Federal Express      ☒ Email
☒ ECF System Participant (Electronic Service)

Signature: /s/AUDRA DRISH

## IN THE DISTRICT COURT OF IOWA FOR POLK COUNTY

| | |
|---|---|
| ROBINETTE KELLEY, | Case No. |
| Plaintiff, | |
| vs. | |
| IOWA STATE UNIVERSITY OF SCIENCE AND TECHNOLOGY, | **PETITION AND JURY DEMAND** |
| Defendant. | |

**COMES NOW** the Plaintiff, Robinette Kelley, by and through her attorneys Newkirk Zwagerman, P.L.C., and for her Petition at Law and in Equity and Jury Demand states as follows:

### PRELIMINARY STATEMENT

1.     Plaintiff Robinette Kelley files this action for discrimination and retaliation under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* (hereinafter "Title IX").

2.     Title IX prohibits discrimination on the basis of sex in educational programs and activities that receive federal financial assistance.

3.     Title IX also prohibits retaliation against individuals that report or oppose practices prohibited under Title IX.

4.     Title IX also prohibits retaliation against individuals who participate in governmental investigations into potential violations of Title IX.

5.     Title IX was enacted in part to curtail the use of federal resources to perpetuate sex-based discrimination and to provide a mechanism by which persons in certain educational programs and activities could seek redress for sex-based discrimination. *See generally* U.S. Department of Justice Title IX Legal Manual p. 16 (January 11, 2011)[1].

---

[1] Available at https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/ixlegal.pdf.

E-FILED 2017 OCT 12 7:57 PM POLK - CLERK OF DISTRICT COURT

6.     The Supreme Court of the United States has held that Title IX has an implied private right of action for discrimination and retaliation. *Cannon v. University of Chicago*, 441 U.S. 677, 717 (1979); *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512 (1982); *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 179 (2005).

7.     The Supreme Court of the United States has held that Title IX cases provide for remedies including, but not limited to, monetary damages and equitable relief. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255-56 (2009); *Barnes v. Gorman*, 536 U.S. 181, 187-88 (2002); *Davis v. Monroe County Bd. of Educ.*, 526, U.S. 629, 633 (1999); *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 62–63 (1992).

8.     Plaintiff also files this action for gender and race discrimination under Title VII of the Civil Rights of 1964.

### THE PARTIES

9.     Plaintiff re-alleges paragraphs 1-8 as if fully set forth herein.

10.    Plaintiff Robinette Kelley is a resident and citizen of North Carolina.

11.    Plaintiff was employed by Defendant as their Title IX Coordinator from February 4, 2013 to October 14, 2015.

12.    As an employee of Defendant, Ms. Kelley is a "person" within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

13.    Defendant Iowa State University of Science and Technology (hereinafter "Iowa State University" or "ISU") is a public state-university located in Ames, Story County, Iowa.

14.    Iowa State University received and continues to receive federal financial assistance.

E-FILED 2017 OCT 12 7:57 PM POLK - CLERK OF DISTRICT COURT

15.     Iowa State University is a recipient of federal financial assistance within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*.; 34 C.F.R. 106.2(h).

16.     The acts of which Plaintiff complains, occurred at Iowa State University, in Ames, Story County, Iowa.

## INTRODUCTION

17.     Ms. Kelley re-alleges paragraphs 1-16 as if fully set forth herein.

18.     Title IX was enacted to protect persons from discrimination based on sex in educational programs and activities that receive federal financial assistance.

19.     Pursuant to the 20 U.S.C. § 1682 enforcement provision, the United States Department of Education has authority "to effectuate the provisions of [§] 1681…by issuing rules, regulations, or orders" interpreting and explaining Title IX (20 U.S.C. 1681 et seq.).

20.     The United States Department of Education has promulgated obligations of recipients under Title IX in the code of federal regulations. *See* 34 C.F.R. pt. 106, *et seq*.

21.     The United States Department of Education regulations should be given substantial deference when looking to understand a university's obligations under Title IX. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844 (1984) ([the Department of Education's] regulations should be accorded "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.")

22.     The United States Department of Education's authority to formulate policy and rule-making for a recipient of federal financial assistance is broad. Department of Education, 65 Fed. Reg. No. 219, 68050 (Nov. 13, 2000) (codified at 34 C.F.R. pts. 100, 104, 106, 110).

E-FILED 2017 OCT 12 7:57 PM POLK - CLERK OF DISTRICT COURT

23.     The United States Department of Education's "regulations are the model for [] Title IX regulations for several reasons: the history of public participation in the development and congressional approval of [the United States Department of Education]'s regulations, [their] leadership role in Title IX enforcement, judicial interpretations of [the Department's] regulations, recipients' familiarity with the regulations, and an interest in maintaining consistency of interpretation of regulations enforcing Title IX." Nondiscrimination on the Basis of Sex in Education Programs or Activities, 65 Fed. Reg. No. 169, 52859 (Aug. 30, 2000) (codified at 29 C.F.R. pt. 54).

24.     "Both Congress and the courts have interpreted Title IX based on [the United States Department of Education's] regulations." Nondiscrimination on the Basis of Sex in Education Programs or Activities, 65 Fed. Reg. No. 169, 52859 (Aug. 30, 2000) (codified at 29 C.F.R. pt. 54).

25.     The Supreme Court of the United States upheld the United States Department of Education's regulations in *North Haven Bd. Of Educ. v. Bell*, 456 U.S. 512 (1982).

26.     Congress has also passed additional legislation to codify the United States Department of Education's interpretation of the statute. Nondiscrimination on the Basis of Sex in Education Programs or Activities, 65 Fed. Reg. No. 169, 52859 (Aug. 30, 2000) (codified at 29 CRF pt. 54) ("Congress also passed the Civil Rights Restoration Act of 1987 (''CRRA''), in large part, to overrule the Supreme Court's decision in *Grove City College v. Bell*, 465 U.S. 555 (1984), and thus to codify Title IX consistent with [the Department of Education's] pre-*Grove City* interpretation of the statute. See S. Rep. No. 100–64, at 2 (1987), reprinted in 1988 U.S.C.C.A.N. 3, 3–4.").

E-FILED 2017 OCT 12 7:57 PM POLK - CLERK OF DISTRICT COURT

27.     The United States Department of Education's Office for Civil Rights (hereinafter "OCR") enforces, among other statutes, Title IX of the Education Amendments of 1972. The OCR was therefore best situated to determine what universities must do to achieve Title IX compliance.

28.     In addition to enforcing Title IX, the OCR provides technical assistance and guidance to recipients of federal funds so that they can take proactive efforts to comply with Title IX prior to a compliance review or a lawsuit.

29.     The United States Department of Education's Office for Civil Rights' guidance documents are sent to all recipients of federal funds, including Defendant, to give them substantive direction on how to become a Title IX-compliant institution.

30.     For example, in April 2011, Iowa State University received a Dear Colleague Letter reminding of their legal obligation to have a designated Title IX Coordinator and that "[t]he coordinator's responsibilities include overseeing all Title IX complaints and identifying and addressing any patterns or systemic problems that arise during the review of such complaints. Dear Colleague Letter, p. 7 (Apr. 2011).

31.     This guidance document explains the legal obligation of educational institutions to designate an employee, like a "Title IX Coordinator," to coordinate the institution's efforts to comply with and carry out its responsibilities under Title IX. 34 C.F.R. § 106.8(a).

32.     In 2015, the United States Department of Education published and disseminated more significant guidance documents interpreting Title IX and its regulations in order to provide a compliance framework for education institutions to follow and implement. The significant guidance documents outline compliance requirements that institutions must follow to ensure that the rights of students, faculty and staff are upheld and enforced and is based on violations the enforcing agencies find in schools they review for compliance violations and their expertise in

E-FILED 2017 OCT 12 7:57 PM POLK - CLERK OF DISTRICT COURT

implementing and enforcing Title IX across the country. *See* Dear Title IX Coordinator at http://www2.ed.gov/about/offices/list/ocr/docs/dcl-title-ix-coordinators-letter-201504.pdf (April 24, 2015); Dear Colleague Letter at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201504-title-ix-coordinators.pdf (April 24, 2015); *see also* Title IX Resource Guide at https://www2.ed.gov/about/offices/list/ocr/docs/dcl-title-ix-coordinators-guide-201504.pdf (April 2015).

33.     On April 24, 2015, the OCR published and disseminated a significant guidance document to institutions, including Defendant, reminding them of the obligation for recipients to designate an independent and effective Title IX Coordinator to ensure that every *person* affected by the operations of the university were aware of the legal rights afforded under Title IX and to ensure that university officials complied with their legal obligations under Title IX. *See* Dear Colleague Letter (April 24, 2015); s*ee also* U.S. Department of Education, Office for Civil Rights, *Title IX Resource Guide* p. 1 (Apr. 2015) ("Title IX protects students, employees, applicants for admission and employment, and other persons from all forms of sex discrimination…") available at https://www2.ed.gov/about/offices/list/ocr/docs/dcl-title-ix-coordinators-guide-201504.pdf.

34.     The April 24, 2015 Dear Colleague Letter on Title IX Coordinators sent to Iowa State University states in part on page 1:

> "[t]o be effective, a Title IX coordinator must have the full support of [their] institution. It is therefore critical that all institutions provide their Title IX coordinators with the appropriate authority and support necessary for them to carry out their duties and use their expertise to help their institutions comply with Title IX."

35.     Through the OCRS's enforcement of Title IX, they "found that some of the most egregious and harmful Title IX violations occur when a recipient fails to designate a Title IX coordinator or when a Title IX coordinator has not been sufficiently trained or given the

appropriate level of authority to oversee the recipient's compliance with Title IX." Dear Colleague Letter, p. 1 (Apr. 2015).

36.   The OCR's Title IX Resource Guide which was sent to recipients of federal funds with a Dear Colleague Letter is another document that provides guidance to schools in complying with the United States Department of Education's regulations. *See* U.S. Department of Education, Office for Civil Rights, *Title IX Resource Guide* (Apr. 2015) available at https://www2.ed.gov/about/offices/list/ocr/docs/dcl-title-ix-coordinators-guide-201504.pdf.   The Resource Guide states in part on page 2:

> "The coordinator should also coordinate the recipient's response to all complaints involving possible sex discrimination to monitor outcomes, identify patterns, and assess effects on the campus climate. Such coordination can help an institution avoid Title IX violations, particularly violations involving sexual harassment and violence, by preventing incidents from recurring or becoming systemic problems."

37.   Enforcement of Title IX is critical to ensuring that federal funds are not used to support or perpetuate sex-based discrimination in educational institutions.

## FACTUAL SUMMARY – ROBINETTE KELLEY

38.   Plaintiff re-alleges paragraphs 1-37 as if fully set forth herein.

39.   Ms. Kelley was hired by Iowa State University (ISU) on February 4, 2013.

40.   Her immediate supervisor was Miles Lackey, Associate Vice President & Chief of Staff, who reported directly to then-President Steven Leath.

41.   ISU hired Ms. Kelley as their Equal Opportunity Director and Title IX Coordinator.

42.   Ms. Kelley was ISU's first permanent director of equal opportunity. When she was hired, Lackey told Ms. Kelley he wanted her to be "the face" of the Equal Opportunity office on campus.

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

43.     Ms. Kelley's job duties included managing equal opportunity and affirmative action programs at ISU.

44.     Pursuant to Title IX and its regulations, Ms. Kelley was supposed to be given full authority to investigate complaints of discrimination, harassment and retaliation on campus and make recommendations for complaint resolution based on that authority and her role as Title IX Coordinator.

45.     Pursuant to Title IX and its regulations, Ms. Kelley's job duties were supposed include the authority to ensure university compliance with laws and regulations.

46.     ISU did not provide Ms. Kelley with the necessary authority or support to implement her authority required by her position and by Title IX.

47.     Examples of ISU's lack of support for Ms. Kelley as Title IX Coordinator include but are not limited to:

    a.  ISU did not provide Ms. Kelley with direct supervision by the President of the University per the April 24, 2015 Dear Colleague Letter on Title IX Coordinators;

    b.  ISU did not give Ms. Kelley the authority to coordinate compliance with Title IX which would have allowed her to identify and proactively address issues related to possible sex discrimination as they arose per the April 24, 2015 Dear Colleague Letter on Title IX Coordinators;

    c.  ISU did not adequately fund or staff Ms. Kelley's office despite the overwhelming amount of equal opportunity and affirmative action programming and compliance needed on campus.

    d.  ISU did not devote resources to ensuring equal educational opportunities for students on the basis of their protected characteristics, including gender.

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

e.  Ms. Kelley was required to serve in multiple roles. She was required to be the Title IX coordinator. She was also the affirmative action compliance officer, the Section 504 Coordinator, and the ADA Compliance Officer. She was also the civil rights investigator and provided all discrimination, harassment, and Title IX training on campus on her own.

48.  Despite the amount of work Ms. Kelley was responsible for, Ms. Kelley performed her job duties at a high level and received good performance evaluations.

49.  Title IX requires areas of authority for designated Title IX Coordinators. ISU denied Ms. Kelley several areas of authority including but not limited to:

a.  Consistent with the Title IX and federal regulation obligations to determine if there were *patterns of behavior*, Ms. Kelley asked for historical information regarding sexual assault complaints and sexual harassment complaints but was denied access to historical information.

b.  Ms. Kelley requested historical information regarding sexual assaults in the ISU Greek Residences and among Greek Life student population. ISU denied Ms. Kelley access to this information which prevented her from using this information proactively or at all in her investigations into sexual assaults that were reported to her—like the sexual assault in *Taylor Niesen v. Iowa State University et al*, Case No. 4:17 CV 201 on file in the Southern District of Iowa.

c.  Ms. Kelley was not permitted to revise the policy and practices on interim measures to protect student victims of sexual assault from having to see their perpetrators on campus. Some of the interim measures that university administrators would not let Ms. Kelley implement and enforce included, but are not limited to: *effective* no

9

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

contact orders, removal of perpetrators from dorms where their victims resided, and academic accommodations for victims of sexual or domestic violence.

    d.  Ms. Kelley was not permitted to ensure that victims of sexual violence and harassment could rely on ISU to provide them with appropriate, case-specific, interim measures that would ensure they were not denied equal education opportunities which is a violation of Title IX.

50.    Upon her hire at ISU, Ms. Kelley realized that ISU was engaging in direct Title IX violations and that ISU had a flawed system-response in place to manage Title IX complaints.

51.    Prior to Ms. Kelley's arrival, Title IX complaints, including sexual assault and sexual harassment complaints, were not investigated unless a criminal complaint had been filed. This is a violation of Title IX. See 2011 Dear Colleague Letter p. 4 ("As discussed later in this letter, the school's Title IX investigation is different from any law enforcement investigation, and a law enforcement investigation does not relieve the school of its independent Title IX obligation to investigate the conduct."); *see also* (2011 Dear Colleague Letter p. 10 ("Schools should not wait for the conclusion of a criminal investigation or criminal proceeding to begin their own Title IX investigation and, if needed, must take immediate steps to protect the student in the educational setting. For example, a school should not delay conducting its own investigation or taking steps to protect the complainant because it wants to see whether the alleged perpetrator will be found guilty of a crime.")

52.    When Ms. Kelley began employment, there was no formal mechanism in place for investigating Title IX complaints and ISU did not draft investigative civil rights reports which is a violation of Title IX. *Compare* 2011 Dear Colleague Letter p. 4 ("Regardless of whether a harassed student, his or her parent, or a third party files a complaint under the school's grievance

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

procedures or otherwise requests action on the student's behalf, a school that knows, or reasonably should know, about possible harassment must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation.")

53.     Ms. Kelley became increasingly concerned with ISU's compliance with Title IX as she became more acclimated to campus and to the administration.

54.     Ms. Kelley began to receive pushback from other administrators regarding Title IX compliance issues.

55.     When Ms. Kelley was hired, ISU was aware that it was not in compliance with Title IX such that when Ms. Kelley was told to be "the face" of equal opportunity on campus it was because ISU wanted her to be seen but not heard.

56.     ISU behaved in a manner that suggested it did not want Ms. Kelley to meaningfully address, change, or remedy Title IX compliance violations and failures.

57.     Ms. Kelley learned that prior to her arrival at ISU, the university's Office of University Counsel made all administrative and compliance decisions relating to Title IX[2]. This practice was used so that university counsel could maintain control over the response and outcomes to Title IX complaints which creates a conflict of interest between the job duties of the general counsel's office and the administration's interest in maintaining the university's public image and the Title IX rights of students, faculty and staff. *Compare* 2011 Dear Colleague Letter p. 7 ("The Title IX coordinators should not have other job responsibilities that may create a conflict of

---

[2] *See  generally*  http://www.universitycounsel.iastate.edu/about  ("The Office of University Counsel provides legal advice and services to Iowa State University. …We do not provide personal legal services to members of the public, students or employees.")

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

interest. For example, serving as the Title IX coordinator and a disciplinary hearing board member or general counsel may create a conflict of interest.").

58.     For example, University General Counsel's office determined interim measures and accommodations, sanctions, charges, and settlements. After Ms. Kelley was hired, General Counsel's office also designated what offices and employees were to be considered confidential in order to prevent them from reporting information to the Title IX Coordinator.

59.     ISU had a pattern and practice of referring student Title IX complainants to the Dean of Students Office or to University Human Resources for cases involving staff or faculty This practice misdirected students to offices that were not disinterested or independent from the rights of sexual assault victims which can conflict with public relations interests of the university.

60.     Deferring or directing sexual assault or Title IX complaints either to in-house counsel or the Dean of Students or University Human Resources is not only a violation of Title IX, but creates added risks to students, faculty or staff who bring these complaints.

61.     In-house counsel, Deans of Students or others to whom these complaints were directed had a vested interest in the outcome of a Title IX complaint.

62.     The lack of Title IX-specific training can also create a higher risk of gender bias affecting the process and the students involved in the investigation-- particularly female students who bring complaints of sexual assault.

63.     In addition to direct violations of Title IX and flaws in compliance that created risk for students, Ms. Kelley would receive push-back and retaliation when she challenged ISU's compliance with Title IX and advocated for the need to take steps to comply with federal and state civil rights laws.

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

64. When Ms. Kelley would raise Title IX compliance issues in meetings and in discussions with high level administrators, she was ignored or discouraged from suggesting that ISU was not in compliance.

65. ISU administrators began to routinely exclude Ms. Kelley from processing complaints that implicated state and federal civil rights laws, including Title IX, that should have been investigated by Ms. Kelley and instead re-directed Title IX matters to the Dean of Students office.

66. For example, Ms. Kelley was excluded from a student-faculty issue regarding an inappropriate video image on campus that should have been handled as a sexual harassment incident but was funneled through General Counsel's office, the Provost Office, and the Division of Student Affairs (which houses the Dean of Students office) instead. OCR guidance states that "[t]he recipient must inform the Title IX coordinator of all reports and complaints raising Title IX issues, even if the complaint was initially filed with another individual or office or the investigation will be conducted by another individual or office." *See* Dear Colleague Letter (April 24, 2015).

67. General counsel and deans of students are explicit categories of employees that should not handle Title IX complaints because the OCR identifies them as individuals that have a conflict of interest in balancing their other job duties and Title IX compliance. *See* Dear Colleague Letter (April 24, 2015).

68. Ms. Kelley asked ISU to let her contract with ATIXA[3] and NCHERM[4] as disinterested third-party contractors to assist with investigations in order to help ISU comply with Title IX. ISU denied this request and instead chose to continue perpetuating the conflict of interest

---

[3] Association of Title IX Administrators (ATIXA) provides a professional association for universities and Title IX Coordinators to achieve gender equity and compliance on campuses. https://atixa.org/about/.
[4] The National Center for Higher Education Risk Management Group, LLC is a group or organizations that provide risk management, compliance, and Title IX expertise to universities. https://www.ncherm.org/.

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

in permitting university counsel and the Student Affairs Division manage Title IX complaints, including student and employee sexual assault and sexual harassment complaints.

69.     Ms. Kelley was told by a previous lawyer in general counsel's office that she had also expressed concerns that the Student Affairs Division was improperly handling Title IX investigations. However, that lawyer's concerns regarding the conflict of interest and violations of Title IX were also ignored.

70.     Ms. Kelley began to receive feedback that suggested she reduce her efforts to comply with Title IX or behave in a manner that would permit ISU to avoid its obligations under Title IX.

71.     On February 25, 2014, Ms. Kelley received a performance evaluation. During the evaluation meeting, Lackey told Ms. Kelley she needed to exhibit better ways to "collaborate" and "show leadership."

72.     Lackey told Ms. Kelley that administrators from the legal department and human resources were afraid of her and afraid to come to her because she was always wearing her "investigator hat" and that other administrators found her harsh and unapproachable.

73.     Lackey also told Ms. Kelley that she was too "litigious" referring to Ms. Kelley's investigation of sexual assault and other complaints instead of funneling them through the Dean's Office or through General Counsel's office.

74.     Despite the negative criticisms directed to her protected activity and efforts to comply with the law, Lackey told Ms. Kelley that her overall performance was "99% good."

75.     Ms. Kelley continued to raise Title IX concerns by making verbal and written complaints regarding Title IX compliance to President Leath, Miles Lackey, Counsel Paul Tanaka, Senior Vice President Thomas Hill, and other key administrators on campus throughout her tenure.

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

76.    These complaints constitute protected activity under Title IX.

77.    Ms. Kelley wrote a detailed Compliance Memo in July 2014 outlining some of her concerns regarding Title IX compliance at ISU which she gave to Associate Vice President & Chief of Staff Miles Lackey.

78.    Ms. Kelley's Compliance Memo called into question ISU policies and practices related to the processing of student complaints, the withholding of incidents of sex-based harassment from the EO/Title IX Office, and the involvement of university counsel in Title IX Investigations, investigations outcomes, and sanctions on campus.

79.    Specifically, Ms. Kelley's Compliance Memo outlined a number of cases where the University's legal department and the Dean of Students were making decisions that were usurping Ms. Kelly's Title IX role and negatively impacting student rights under Title IX.

80.    All of Ms. Kelley's Compliance Memo concerns had the potential to vitiate the Title IX rights of students, faculty, and staff on campus.

81.    Ms. Kelley's Compliance Memo is protected activity under Title IX. "Title IX makes it unlawful to retaliate against individuals—including Title IX coordinators--…when they participate in a Title IX investigation, hearing, or proceeding or advocate for others' Title IX rights." *See* Dear Colleague Letter (April 24, 2015) (*citing* 34 C.F.R. § 106.71 (incorporating by reference 34 C.F.R. § 100.7(e))).

82.    In response to receiving and reviewing Ms. Kelley's Compliance Memo, the university counsel, human resources, and the president's office retaliated against Ms. Kelley and ramped up efforts to marginalize her authority on campus.

83.    Ms. Kelley was told that ISU upper-level administrators did not feel they could "trust" her and accused her of not being "collaborative."

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

84. Instead of collaborating with Ms. Kelley in her efforts to bring ISU into compliance with Title IX, ISU administrators intimidated Ms. Kelley, made veiled threats, and attempted to coerce her into backing down from pursuing meaningful responses to her compliance concerns on campus. All of these retaliatory behaviors were aimed at interfering with her job duties. *See* Dear Colleague Letter (April 24, 2015).

85. For example, student complaints of sexual assault require an approach that is fully compliant with Title IX. They require proper training and understanding of the role that gender bias plays in such responses. They require a neutral response team and not one motivated to sweep allegations under the rug or to ignore the likely retaliation that may occur.

86. In April 2015, OCR began a compliance review of ISU's non-compliant policies and practices.

87. The OCR complaint that lead to the investigation had been filed by a female victim of sexual assault. In Fall 2014, when the victim learned that her perpetrator would be housed in a residence hall adjacent to her residence hall, she requested that his housing be moved. ISU permitted the Dean of Students to process this request even though it was an interim measure in a sexual assault case which should have been handled by Ms. Kelley.

88. Ms. Kelley had found that the respondent had engaged in non-consensual sexual activity with the female victim. When Lackey learned of this finding, he debated with Ms. Kelley regarding her finding and told her that she should not have found a violation of the sexual misconduct policy. ISU Campus police also informed Ms. Kelley that they disagreed with her finding. Lackey and Campus Police are not responsible for, nor are they trained on, investigating Title IX complaints. Their insistence that Ms. Kelley's findings were wrong illustrate ISU's

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

interference with Ms. Kelley's Title IX Coordinator role and ISU's continued practice of Title IX violations.

89.     Dean Pamela Anthony decided she would not move the perpetrator over Ms. Kelley's advocacy for appropriate interim measures and objections to ISU's decision to provide the perpetrator-respondent with leniency, deference, and more rights, benefits and access to educational opportunities than the female victim.

90.     Page 16 of the April 2011 Dear Colleague Letter states that "[d]epending on the specific nature of the problem, remedies for the complainant might include, but are not limited to… moving the complainant or alleged perpetrator to a different residence hall[.]"

91.     Ms. Kelley advocated for the interim measure in accordance with the OCR'S 2014 Q&A on Title IX and Sexual Violence which expounds on the 2011 Dear Colleague Letter and the OCR's Revised Sexual Harassment Guidance regarding interim measures. *See* Questions and Answers on Title IX and Sexual Violence available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf; Dear Colleague Letter (Apr. 2011); OCR's Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties (Jan. 2001) available at https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.  Ms. Kelley spoke to Lackey about the basis for the interim measure, but he chose to ignore Ms. Kelley.  Additionally, the Dean of Students claimed she did not move the perpetrator-respondent because she did not have, and was not relying on, Ms. Kelley's investigation report which ignores the Dear Colleague Letter and violates Title IX.

92.     In addition to this student victim complaint, there were other interim measures that Ms. Kelley was not able to provide to student victims and complainants or have influence over

17

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

because she was told it was under the purview of the Dean of Students office.  This violates Title IX.

93.     ISU Counsel Paul Tanaka scheduled and led a meeting for all administrators that were identified by the OCR for interviews. Ms. Kelley was one of the administrators the OCR intended to interview.

94.     During the meeting, Tanaka instructed all that were present to not discuss or share their knowledge regarding decisions made relating to the student OCR complaint that prompted the OCR Compliance review. Tanaka instructed all present to deny knowledge to the OCR about why individuals or offices had made certain decisions.

95.     Ms. Kelley was interviewed by an OCR Investigator in April 2015. Much of the interview centered on Ms. Kelley's role and lack of authority on campus.

96.     After her interview, Ms. Kelley told Lackey what topics she discussed during her interview. She also told him that the OCR investigator told her that she could file an OCR complaint during her interview based on Ms. Kelley's lack of independence, authority and other compliance concerns.

97.     In May 2015, Ms. Kelley learned that Senior Vice President of Student Affairs Thomas Hill organized a sexual misconduct retreat to take place in August 2015. The agenda for the retreated included discussion of policies, procedures, training and a sexual misconduct coordinator position—all of which fall under the purview of the Title IX Coordinator. Senior Vice President Hill placed Dean Anthony in charge of the retreat instead of Ms. Kelley which is another example of ISU funneling Title IX functions to an office that has a conflict of interest with the Title IX rights of students.

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

98.     Ms. Kelley complained to her supervisor, Lackey that the retreat was another effort to usurp and marginalize her role as the independent Title IX Coordinator on campus. Ms. Kelley asked Lackey to intervene because she perceived the agenda for the retreat was another effort of the Senior Vice President to keep all Title IX complaints, investigations, outcomes and statistical information hidden under the purview of Student Affairs and General Counsel's office so that Ms. Kelley would not have access to pertinent complaints, violations, and statistical information regarding campus sexual assaults, harassment, and other Title IX matters. *Compare* 2011 Dear Colleague Letter p. 7 ("The coordinator's responsibilities include overseeing all Title IX complaints and identifying and addressing any patterns or systemic problems that arise during the review of such complaints.").

99.     Lackey did not address Ms. Kelley's complaint.

100.    During the August 2015 retreat, it was announced that ISU was going to create a Sexual Misconduct Coordinator position in the Student Affairs Division.

101.    Ms. Kelley again complained to her supervisor that the decision-making surrounding the sexual misconduct coordinator position was meant to usurp the compliance function of her position as Title IX Coordinator, but he did not do anything to support her.

102.    Ms. Kelley also learned that on the day of the retreat, Senior Vice President Hill told an ISU employee that worked with Ms. Kelley that the university was creating the sexual misconduct coordinator position because the university wanted a position in the Dean of Students office so that student-victims could go there instead of the Equal Opportunity (Ms. Kelley's) office.

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

103.    On September 1, 2015, Ms. Kelley received praise from a member of the Board of Regents for a training she conducted just prior to her termination. Lackey and President Leath were copied on the email.

104.    Ms. Kelley's last performance evaluation was on September 4, 2015-- five weeks and five days prior to her termination.

105.    During the evaluation meeting with her supervisor Miles Lackey, Ms. Kelley brought up her August 2015 complaint regarding the lack of independence and authority of her office to enforce Title IX on campus.

106.    In response, Mr. Lackey brought up two complaints made against Ms. Kelley by a former employee she supervised. The first complaint was from two years prior in 2013. The second complaint was from April 2015—during the time Ms. Kelley participated in the OCR investigation. At the time both alleged complaints were made, Lackey did not bring them to Ms. Kelley's attention. Despite being blindsided with old complaints made against her, Lackey also told Ms. Kelley that her overall performance was "95% good."

107.    On September 30, 2015, during an open forum meeting set up by the Latino Student Group to discuss racism and discrimination on the campus, students questioned Senior Vice President Hill, University President Leath and Dean Anthony about where they should go to file complaints or address concerns with discrimination, harassment and racism at the school. A student, Dan Carney, told the President that one of his senior cabinet members was telling students, faculty and staff not to go to the Equal Opportunity Office because that office (Ms. Kelley's Office) wouldn't do anything.

108.    Despite her objectively good performance, Ms. Kelley was fired on October 14, 2015 by Miles Lackey.

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

109.     On October 27, 2015 Ms. Kelley had a phone call with ISU President Steven Leath and the Vice President of Human Resources, Julie Nuter. Ms. Kelley was told that Miles Lackey, her immediate supervisor, had justified her termination because Ms. Kelley had turned down Lackey's suggestions to attend leadership training and classes—which is not true.

110.     Vice President Nuter added that Mr. Lackey wanted to take the Equal Opportunity/Title IX office in a different direction and that he did not feel Ms. Kelley had the leadership skills to move the office in a new direction.

111.     In fact, during her employment at ISU, Ms. Kelley was a student in a PhD program for higher education administration with a study focus on leadership. Ms. Kelley frequently discussed her PhD program with Lackey and had obtained approval to attend the program from Lackey. Ms. Kelley earned her doctorate degree in Higher Education Administration with an emphasis in Educational Leadership on August 11, 2017.

112.     When Ms. Kelley's job was posted, the job posting had all the same duties with the exception that the position required *less* education and experience.

## COUNT I: TITLE IX DISCRIMINATION

113.     Ms. Kelley re-alleges paragraphs 1-112 as if fully set forth herein.

114.     The OCR has instructed *recipients*, the nature of the Title IX Coordinator position requires a level of independence, support from the recipient, and authority. *See* Dear Colleague Letter (April 24, 2015).

115.     Title IX Coordinators must be fully vested of their rights under the law. 34 C.F.R. § 106.8(a). This is precisely what Ms. Kelley was denied at ISU from day one which is a violation of Title IX.

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

116.    Ms. Kelley was not permitted to exercise independence and authority over Title IX complaints, investigations and outcomes which is a violation of Title IX.

117.    ISU usurped Ms. Kelley's designated position as Title IX Coordinator by creating conflicts of interest in the processing, case management, and sanctions of student and employee Title IX complaints which is a violation of Title IX.

118.    The usurpation, removal, and watering down of Ms. Kelley's Title IX Coordinator job duties, independence, influence, and authority is a violation of Title IX.

119.    The violations of Title IX and the approach of ISU to complaints of sexual assault and sexual harassment place employees and students at risk of sex based discrimination in violation of Title IX.

120.    Ms. Kelley had the right under Title IX to advocate for and assert the Title IX rights of ISU students, faculty and staff. This right was denied, which is a violation of Title IX.

121.    As the 2011 Dear Colleague Letter notes on page 2, "The statistics on sexual violence are both deeply troubling and a call to action for the nation."

122.    ISU's inaction indicates their deliberate indifference to the rights Ms. Kelley advocated for on behalf of female victims of sexual assault.

123.    ISU chose inaction in light of the statistics and enforcement guidance that was provided to them by the U.S. Department of Education.

124.    ISU chose inaction when they ignored Ms. Kelley's consistent reminders of the Title IX obligations of the university and when she advocated for the Title IX rights of students, faculty and staff.

125.    ISU's inaction despite their actual knowledge of their Title IX non-compliant practices and Ms. Kelley's objections to the same is a violation of Title IX.

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

126.    As a direct and proximate result of the Defendant's actions, Ms. Kelley suffered and continues to suffer lost earnings and benefits, emotional distress, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, and inconvenience.

## COUNT II: TITLE IX RETALIATION

127.    Plaintiff re-alleges paragraphs 1-126 as if fully set forth herein.

128.    Title IX's regulations incorporate by reference the retaliation provision of Title VI of the Civil Rights Act of 1964.

129.    Title IX makes it unlawful to retaliate against individuals—including Title IX coordinators—not just when they file a complaint alleging a violation of Title IX, but also when they participate in a Title IX investigation, hearing, or proceeding, or advocate for others' Title IX rights.

130.    "Title IX's broad antiretaliation provision protects Title IX coordinators from discrimination, intimidation, threats, and coercion for the purpose of interfering with the performance of their job responsibilities.  A recipient, therefore, must not interfere with the Title IX coordinator's participation in complaint investigations and monitoring of the recipient's efforts to comply with and carry out its responsibilities under Title IX." Dear Colleague Letter on Title IX Coordinators, p. 4 (Apr. 2015).

131.    Title IX Coordinators must be fully vested of their rights under the law. 34 C.F.R. § 106.8(a). ISU did not permit Ms. Kelley to exercise her duties required under Title IX thereby violating Title IX. After Ms. Kelley complained verbally and in writing that ISU was violating Title IX she was fired in violation of Title IX.

132.    Ms. Kelley was entitled to assurance under Title IX that her fulfillment of her job duties under Title IX would be fully authorized and supported but she was denied this right.

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

133.    Ms. Kelley had the right to fulfill her job duties under Title IX without fear of retaliation, but she was denied this right.

134.    Ms. Kelley had the right to participate freely and honestly in the OCR investigation interview in April 2015 without fear of reprisal, intimidation, or coercion, but she was denied this right.

135.    Ms. Kelley had the right to challenge policies and practices at ISU that functioned to deny equal education opportunities to students and employees based on gender in all areas covered by Title IX without fear of retaliation.

136.    Ms. Kelley was protected from retaliation pursuant to Title IX regulations that "incorporate the requirement in the Title VI regulations, which provides that '[n]o recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by [Title VI], or because he [or she] has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subpart.'" 34 C.F.R. § 106.71 (incorporating the retaliation language of the regulations under Title VI); 34 C.F.R. § 100.7(e).

137.    Ms. Kelley was not encouraged to help ISU comply with Title IX and promote gender equity in ISU's educational programs and activities. Instead she was fired on October 14, 2015.

138.    ISU's retaliatory actions included, but are not limited to: taking away Ms. Kelley's decision-making authority, re-directing complaints away from her office and purview, ignoring her recommendations on sanctions and interim measures, denying her the ability to perform her duties with regard to Title IX compliance, and ultimately terminating her. These retaliatory acts caused Ms. Kelley to suffer adverse consequences in her employment.

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

139.   Ms. Kelley's retaliatory and discriminatory termination resulted in the loss of Title IX protections and rights for all students and employees (persons) at Iowa State University who were benefitting from her training, education, and her ability to lead and resolve compliant investigations into harassment, sexual assault, and discrimination on campus.

140.   Ms. Kelley would not have been fired had she agreed to participate in Iowa State University's *non-Title IX-compliant* policies and practices.

141.   Ms. Kelley would not have been fired had she agreed to not be honest or forthright in her investigative interview with OCR.

142.   Ms. Kelley would not have been fired had she not made protected complaints to upper level administrators regarding the university's lack of compliance with Title IX and the resulting harm on the Iowa State University community.

143.   By ignoring, stifling and otherwise discouraging Ms. Kelley's complaints regarding Title IX compliance, and by punishing Ms. Kelley for her complaints and participating in the OCR investigation, Iowa State University institutionalized sex based discrimination in direct violation of Title IX and its applicable federal regulations and guidance.

144.   Iowa State University's policy and practice of diverting Title IX complaints, investigations and outcomes away from the Title IX Coordinator's purview institutionalized a system by which female victims of violence were not provided equal educational opportunities on campus which violates Title IX.

145.   The majority of victims of sexual violence and harassment at ISU are women. By removing and undermining Ms. Kelley's authority as Title IX Coordinator, male perpetrators of sexual and domestic violence were given disproportionate protections in the Title IX investigation process and given *more than* equal benefits and opportunities in educational programs and

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

activities while female victims were given *less than* equal benefits and opportunities in ISU's educational programs and activities. This systemic gender bias has tainted the benefits of equal opportunity for female employees and students on campus and has proximately caused harms expressly prohibited by Title IX.

146.     As a direct and proximate result of the Defendant's actions, Ms. Kelley suffered and continues to suffer lost earnings and benefits, emotional distress, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, and inconvenience.

## COUNT III: TITLE VII RACE & GENDER DISCRIMINATION

147.     Plaintiff re-alleges paragraphs 1 through 146 as if fully set forth herein.

148.     Plaintiff is an African American female protected from race and sex discrimination in her employment pursuant to Title VII of the Civil Rights Act.

149.     Women of color are often hired to be the "face" of organizational diversity offices or initiatives and are asked to play a figure-head role in administration rather than to engage as an equal with authority. When she was hired, Mr. Lackey told Ms. Kelley he wanted her to be "the face" of the Equal Opportunity office on campus. As previously alleged herein, ISU wanted Ms. Kelley to be seen not heard.

150.     Ms. Kelley's male and white colleagues were treated with more respect than Ms. Kelley and their ideas, concerns, and suggestions were given deference because they were permitted to exercise the authority of their positions on campus.

151.     Ms. Kelley's male and white colleagues in ISU's Administration were permitted to exercise the fullest extent of the authority set forth in their job descriptions, yet Ms. Kelley was not given the independence or authority required of her position as Title IX Coordinator under Title IX, its rules and regulations.

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

152.    Following the OCR's 2015 Title IX investigation into ISU's non-compliant practices, Ms. Kelley's male and white colleagues were given opportunities to resign from ISU with significant buyouts or severance payments, but Ms. Kelley was summarily, and wrongfully, fired.

153.    Ms. Kelley's male and white colleagues that had perpetuated sex-based discrimination at ISU were permitted to salvage their professional reputations, careers, and retirements by resigning from ISU with significant monetary buyouts or payments while Ms. Kelley, who consistently reported ISU's Title IX non-complaint practices and gave ISU several opportunities to become compliant, was fired as if she had done something wrong.

154.    As a direct and proximate result of the Defendant's actions, Ms. Kelley suffered and continues to suffer lost earnings and benefits, emotional distress, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, and inconvenience.

## EQUITABLE RELIEF

155.    Plaintiff incorporates by reference all paragraphs alleged herein.

156.    Iowa State University should be subject to an injunction to immediately provide for a strategic plan for the Title IX office to review policies and procedures on sex discrimination and to participate in the drafting and revision of those policies to outline best practices in line with Title IX.

157.    Iowa State University should be subject to an injunction prohibiting further adverse action to the Iowa State University Title IX Coordinators and employees for reporting compliance concerns, opposing Title IX-non-compliant practices, or participating in federal or state civil rights investigations;

27

E-FILED 2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

158.    Iowa State University should be subject to an injunction to draft a comprehensive policy providing that all Title IX Coordinators and Deputy Coordinators at ISU shall be fully vested with the independence, authority and support required under Title IX and its guidance;

159.    Iowa State University should be enjoined from further violations of Title IX and required to specifically authorize its Title IX Coordinator to act independently from in-house counsel, human resources, university Administrators, or other internal departments;

160.    Iowa State University should undergo a historical analysis of sexual assaults and sexual harassment complaints on campus to determine what, if any, systemic sex-based discrimination violations are occurring on campus and within student organizations and communities including but not limited to ISU's Greek Community and ISU's athletic programs;

161.    The Court should take any further equitable and injunctive action necessary to remedy the harm to Ms. Kelley, to bring Iowa State University into compliance with Title IX and to prevent gender-based discrimination the results in harm to administrators, employees and students in the Iowa State University community.

**WHEREFORE**, Plaintiff Robinette Kelley respectfully requests judgment in her favor and against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for emotional distress damages, for lost wages, for punitive damages, for interest as allowed by law, for attorneys' fees, for the costs of this action, and for such other relief as the Court may deem appropriate.

## REQUEST FOR JURY TRIAL

**COMES NOW** the Plaintiff, Robinette Kelley, and respectfully requests a jury trial in the above-captioned matter.

E-FILED  2017 OCT 12 7:37 PM POLK - CLERK OF DISTRICT COURT

**NEWKIRK ZWAGERMAN, P.L.C.**

*/s/*Beatriz Mate-Kodjo_____
Thomas Newkirk  AT0005791
tnewkirk@newkirklaw.com
Beatriz Mate-Kodjo AT 0012331
bmate-kodjo@newkirklaw.com
521 E. Locust Street, Suite 300
Des Moines, IA 50309
Telephone:  (515) 883-2000
Fax:  (515) 883-2004

**ATTORNEYS FOR PLAINTIFF**

Original filed.

IN THE DISTRICT COURT OF IOWA FOR POLK COUNTY

| | |
|---|---|
| ROBINETTE KELLEY, | CL No:  LACL139210 |
| Plaintiff, | |
| vs. | **CERTIFICATE OF SERVICE** |
| IOWA STATE UNIVERSITY OF SCIENCE AND TECHNOLOGY | |
| Defendant. | |

The undersigned, Jordan Miner, hereby certifies that a true and correct copy of the Original Notice and Petition and Jury Demand were served, via hand delivery to Nathan Blake on this 31st day of October 2017, to the following:

> Nathan Blake
> Office of the Attorney General of Iowa
> Hoover State Office Building
> 1305 E. Walnut Street
> Des Moines, IA 50319

NEWKIRK ZWAGERMAN, P.L.C.

_____/s/ Jordan Miner_____

Jordan Miner
Legal Assistant
521 E. Locust Street, Suite 300
Des Moines, IA 50309
Telephone:  515-883-2000