# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF IOWA

# CENTRAL DIVISION

| | |
|---|---|
| ROBINETTE KELLEY, | Case No: 4:17-cv-00397-JEG-HCA |
| Plaintiff, | |
| v. | |
| IOWA STATE UNIVERSITY OF SCIENCE AND TECHNOLOGY, | PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER OPPOSITION TO DEFENDANT'S MOTION TO DISMISS |
| Defendant. | |

**COMES NOW** the Plaintiff, Robinette Kelley, by and through her undersigned attorneys, and hereby resists Defendant's motion to dismiss pursuant to Local Rule 7e and 7h. For her brief in support of this opposition Kelley states the following:

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. 2

INTRODUCTION ........................................................................................................... 7

FACTUAL SUMMARY .................................................................................................. 7

1

MOTION TO DISMISS STANDARD .............................................................................. 9

ARGUMENT ............................................................................................................... 11

   I.  Kelley's Complaint Plausibly States a Claim Under Title IX for Retaliation ......... 11

     A. Title IX Prohibits Retaliation for Advocacy, Opposition, and Participation ....... 11

     B. Title VII's "Manager Rule" Does not Apply or Fails When Applied .................. 14

     C. Count II of Kelley's Petition Plausibly States a Prima Facie Claim for Retaliation
       in Violation of Title IX. ...................................................................................... 20

   II.  Count I of Kelley's Complaint Plausibly States Claim for Gender Discrimination in
      violation of Title IX .............................................................................................. 26

     A. Kelley Has Standing to Pursue Count I .............................................................. 27

     B. The claims asserted in Count I of Kelley's Complaint are not moot .................... 34

   III. Count III: Kelley's Complaint Plausibly States Claim Under Title VII for Gender and
      Race Discrimination .............................................................................................. 35

   REQUEST FOR ORAL ARGUMENT .......................................................................... 37

**TABLE OF AUTHORITIES**

**Cases**

*A.B. ex rel. C.D. v. Rhinebeck Cent. Sch. Dist.*, 224 F.R.D. 144 (S.D. N.Y. 2004) ..................... 24

*Albemarle Paper Co. v. Moody,* 422 U.S. 405 (1975) ................................................................. 20

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974) .............................................................. 23

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ....................................................................... 23, 35

*Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006) ............................................................ 36

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................... 9

*Atkinson v. Lafayette College*, 653 F. Supp. 2d 581 (E.D. Pa. 2009) .............................. 15, 16, 17

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................ 9

*Bowers v. Baylor Univ.*, 862 F. Supp. 142 (W.D. Tex. 1994) ...................................... 24

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) ............................... 22, 31

*Brine v. Univ. of Iowa*, 90 F.3d 271 (8th Cir. 1996) ................................................ 22, 30

*Briscoe v. Fred's Dollar Store, Inc.*, 24 F.3d 1026 (8th Cir. 1994) ............................... 34

*Clausen v. Nat'l Geographic Soc.,* 664 F. Supp. 2d 1038 (D.N.D. 2009*)* .................................. 20

*Cox v. Infomax Office Systems, Inc.,* No. 4:07-cv-0457-JAJ, 2009 WL 124700 (S.D. Iowa Jan. 16,

2009) ........................................................................................................... 36

*Craig v. Boren*, 429 U.S. 190 (1976) ..................................................................... 28, 32

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999) ................... 21, 33

*Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545 (3d Cir. 2017) ........................................... passim

*EEOC v. HBE Corp.*, 135 F.3d 543 (8th Cir. 1998) .............................................. 15, 18

*Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009) ......................................... 32

*Fox v. Pittsburg St. Univ.*, 257 F. Supp. 3d 1112 (D. Kan. 2017) ................................. 24

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000)28

*Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274 (1998) ........................................ 21

*Gilster v. Primebank*, 884 F. Supp. 2d 811 (N.D. Iowa 2012) ...................................... 31

*Gupta v. Albright Coll.*, No. Civ–A–05–1921, 2006 WL 162977 (E.D. Pa. Jan. 19, 2006) ........ 24

*Hafley v. Lohman*, 90 F.3d 264 (8th Cir. 1996) ...................................................... 10

*Henschke v. N.Y. Hospital–Cornell Medical Center*, 821 F. Supp. 166 (S.D. N.Y. 1993) .......... 24

*In re: Pre-Filled Propane Tank Antitrust Litigation*, 860 F.3d 1059 (8th Cir. 2017) .................. 10

*Ivan v. Kent State Univ.*, No. 94–4090, 1996 WL 422496 (6th Cir. 1996) .................................. 24

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) ....................................... 11, 12, 26, 27

*Johnson v. Arkansas State Police*, 10 F.3d 547 (8th Cir. 1993) .................................... 14

*Johnson v. City of Shelby*, 135 S. Ct. 346 (2014) ........................................ 11

*Johnson v. Railway Exp. Agency, Inc.*, 421 U.S. 454 (1975) ....................................... 23

*Johnson v. University of Cincinnati*, 215 F.3d 561 (6th Cir. 2000)........................................ 19, 20

*Kaiser Aluminum & Chem. Corp.*, 443 U.S. 193 (1979)............................................ 19

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) ............................................. 28, 29

*Lakoski v. James* 66 F.3d 751 (5th Cir. 1995) ............................................. 24

*Lewis v Heartland Inns of Am., L.L.C.*, 591 F.3d 1033 (8th Cir. 2010) ....................................... 36

*Ludlow v. Nw. Univ.*, 125 F. Supp. 3d 783 (N.D. Ill. 2015) ......................................... 25

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)...................................................... 29, 30

*McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855 (8th Cir.2009).................................. 36

*McKenzie v. Renberg's, Inc.*, 94 F.3d 1478 (10th Cir. 1996) .......................................... 14, 15, 18

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) .................................................. 37

*N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512 (1982) .......................................... 22, 23, 26

*Ogden v. Wax Works, Inc.*, 29 F. Supp. 2d 1003 (N.D. Iowa 1998)............................................ 31

*Powers v. Ohio*, 499 U.S. 400 (1991).......................................................... 29

*Preston v. Commonwealth of Virginia ex rel. New River Cmty. Coll.*, 31 F.3d 203 (4th Cir. 1994)

............................................................................................................ 24

*Roe v. St. Louis Univ.*, 746 F.3d 874 (8th Cir. 2014)................................................ 21

*Roe v. Wade*, 410 U.S. 113 (1973)............................................................. 34

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) .................................................................................. 10

*Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017)................................................................ 29

*Singleton v. Wulff*, 428 U.S. 106 (1976) ....................................................................... 29, 32, 33

*Skare v. Extendicare Health Servs., Inc.*, 515 F.3d 836 (8th Cir. 2008)................................ 15, 16

*St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502 (1993)................................................................ 14

*Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229 (1969) ........................................................ 11

*Thorn v. Amalgamated Transit Union,* 305 F.3d 826 (8th Cir. 2002) ......................................... 20

*Tompkins v. Barker*, 2011 WL 3583413 (M.D. Ala. July 26, 2011) ........................................... 25

*Torres v. Sch. Dist. of Manatee Cty., Fla.*, 2014 WL 4185364 (M.D. Fla. Aug. 22, 2014) ......... 25

*Tyler v. Univ. of Arkansas Bd. of Trustees*, 628 F.3d 980 (8th Cir. 2011) .................................. 36

United States Postal Service Bd. of Governors v. Aikens, 460 U.S. 711 (1983) ........................ 14

*Vandiver v. Little Rock Sch. Dist.*, 2007 WL 2973463 (E.D. Ark. Oct. 9, 2007) ........................ 25

*Waid v. Merrill Area Pub. Schs*., 91 F.3d 857 (7th Cir. 1996) .................................................... 24

*Wineland v. Casey's Gen. Stores, Inc.*, 554 F. Supp. 2d 915 (S.D. Iowa 2008)......................... 10

*Winter v. Pennsylvania State Univ.*, 172 F. Supp. 3d 756 (M.D. Pa. 2016). .............................. 24

**Statutes**

42 U.S.C. § 2000e–2(m) ............................................................................................................. 36

**Other Authorities**

118 Cong. Rec. 24684 (1972) ..................................................................................................... 23

13D Wright & Miller Federal Practice and Procedure § 3564 (3d ed.)....................................... 11

5 C. Wright & A. Miller, § 1215, (3d ed. 2002) ......................................................................... 10

Advisory Committee Report of October 1955, reprinted in 12A C. Wright, A. Miller, M. Kane, R.

     Marcus, and A. Steinman, Federal Practice and Procedure, (2014 ed.) .................................. 10

Dept. of Education, Office for Civil Rights, Revised Sexual Harassment Guidance, January 2001

........................................................................................................................................... 13

**Rules**

FRCP 8(a)(2)........................................................................................................................... 9, 10

**Regulations**

34 C.F.R part 106, Subpart E................................................................................................... 22

34 C.F.R. § 106.31(a)-(b)........................................................................................................ 12

34 C.F.R. § 106.4 ................................................................................................................... 12

34 C.F.R. § 106.51 ................................................................................................................. 22

34 C.F.R. § 106.71 ................................................................................................................. 12

34 C.F.R. § 106.8(a)............................................................................................................... 26

## INTRODUCTION

Kelley alleged Title IX Gender Discrimination, Title IX Retaliation, and Title VII race and gender discrimination and seeks monetary relief, equitable, and other relief. Count I is based on Defendant's violation of the rights of Kelley and of Iowa State University ("ISU") students by interfering with Kelley's exercise of her statutorily required job, including terminating Kelley and replacing her with a less qualified individual in order to prevent compliance with Title IX which is sex discrimination in violation of Title IX. Count II is based on ISU's decision to fire Kelley in connection with her protected activity that extended beyond the scope of her regular job duties which is retaliation in violation of Title IX. Count III is based on the differential treatment of Kelley as an African American female employee at ISU compared to white and male colleagues. ISU requests that the Court dismiss Counts I and II claims relying on an erroneous standing analysis and by attempting to misconstrue the Department Of Education ("DOE") decision to withdraw and reissue agency guidance to argue Kelley has no claims while ignoring Title IX and its regulations, the controlling law creating the substantive issues in Counts I and II.

ISU's arguments are misplaced and supported by factual inferences drawn in its favor. The motion to dismiss must be denied because 1) Kelley has Article III standing to bring a Title IX discrimination claim for monetary and equitable relief against ISU and all prudential standing considerations are satisfied, and 2) Kelley has alleged sufficient facts to allow the Court to draw reasonable inferences regarding Iowa State University's liability under Title IX and Title VII for sex discrimination and retaliation.

## FACTUAL SUMMARY

Robinette Kelley was employed by ISU as the Title IX Coordinator from February 4, 2013 to October 14, 2015. (Petition and Jury Demand, ECF No. 1 ¶ 11) (hereinafter Complaint).

Kelley's immediate supervisor was Miles Lackey, Associate Vice President & Chief of Staff, who reported directly to University President Steven Leath. (Complaint ¶ 40). Ms. Kelley was ISU's first permanent director of equal opportunity. (Complaint ¶ 42). When she was hired, Lackey told Ms. Kelley he wanted her to be "the face" of the Equal Opportunity office on campus. (Complaint ¶ 42). As Equal Opportunity Director and Title IX Coordinator, Kelley's duties were supposed to include authority to investigate complaints of discrimination, harassment, and retaliation on campus; authority to make recommendations for resolution of those complaints; and to ensure compliance with Title IX. (Complaint ¶¶ 44-45). However, ISU wanted Kelley to be seen and not heard. (Complaint ¶ 55). ISU did not provide Ms. Kelley with the necessary authority or support to be Title IX Coordinator. (Complaint ¶ 46). Kelley's office was not adequately funded or staffed. (Complaint ¶ 47(c)). Unfortunately as "the face" of equal opportunity on campus, Kelley was prohibited from performing what should have been Title IX compliance duties. (Complaint ¶¶ 42, 49). Kelley received pushback from other administrators regarding Title IX compliance issues. (Complaint ¶ 54,63). ISU interfered with Kelley receiving Title IX complaints and misdirected students away from Kelley's office. (Complaint ¶¶ 58-60). ISU undermined Kelley's efforts to enforce Title IX compliance through an established policy of directing Title IX related complaints to individuals and departments without adequate gender bias training and whose interests in protecting the University from liability or reputational harm created a conflict of interest in Title IX investigations and an increased risk of sex discrimination at ISU. (Complaint ¶¶ 61-62).

Kelley became increasingly concerned with ISU's compliance with Title IX. (Complaint ¶¶ 50, 53). Kelley made several verbal and written complaints to administrators. (Complaint ¶ 75-76). However, when Kelley advocated for students or opposed non-compliant practices in meetings she was ignored and discouraged from suggesting ISU was not in compliance.

(Complaint ¶¶ 64-65). Instead, Kelley received feedback that suggested she reduce her compliance efforts. (Complaint ¶ 70). Specifically, Kelley was told she needed to "collaborate" more, that she was always wearing her "investigator hat" and that she was too "litigious." (Complaint ¶¶ 70-73). Despite the pushback from administrators on compliance issues, Kelley performed her job objectively well and received good evaluations. (Complaint ¶¶ 48, 74).

Kelley submitted a Compliance Memo in July 2014 to her supervisor outlining her Title IX compliance concerns and providing examples that negatively impacted student rights under Title IX. (Complaint ¶ 77-81). In response to the Compliance Memo, ISU administrators told Kelley they felt they could not "trust" her and accused her of not being "collaborative." (Complaint ¶ 82-85). Beginning in April 2015, U.S. Department of Education's Office for Civil Rights, (hereinafter "OCR") began a compliance review at ISU. (Complaint ¶ 86). Kelley participated in the OCR on-campus investigation because she had knowledge of the student complaint that prompted the OCR investigation. (Complaint ¶ 86-89). ISU interfered with Kelley's participation in the investigation. (Complaint ¶¶ 93-96). Kelley continued to advocate for student rights and to oppose ISU's unlawful Title IX practices, but was ultimately fired in response. (Complaint ¶¶ 98-99, 101, 105, 108).

## MOTION TO DISMISS STANDARD

A pleading "must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief." FRCP 8(a)(2). A motion to dismiss should not be granted where a plaintiff has pled "enough facts to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendants are liable for the misconduct alleged." *Id.* A motion to

dismiss can only be granted when "it appears beyond a doubt" that a complaint fails to "state a claim to relief that is plausible on its face." *Twombly.*, 55 U.S. at 570. In the post-*Twombly/Iqbal* age it remains the case that a complaint is to be construed "liberally in the light most favorable" to plaintiff. *In re: Pre-Filled Propane Tank Antitrust Litigation*, 860 F.3d 1059, 1070 (8th Cir. 2017) (quoting *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008)).

ISU is asking the Court to narrowly construe the pleadings in the light most favorable to Iowa State University. However, a court must liberally construe the pleadings and accept the facts alleged as true. *Wineland v. Casey's Gen. Stores, Inc.*, 554 F. Supp. 2d 915, 917-18 (S.D. Iowa 2008) (internal citations omitted). The Court must "construe all reasonable inferences [from Plaintiff's Complaint] in favor of [the Plaintiff]." *Hafley v. Lohman*, 90 F.3d 264, 267 (8th Cir. 1996). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

> [The Federal Rules] do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted. *See* Advisory Committee Report of October 1955, reprinted in 12A C. Wright, A. Miller, M. Kane, R. Marcus, and A. Steinman, Federal Practice and Procedure, p. 644 (2014 ed.) (Federal Rules of Civil Procedure "are designed to discourage battles over mere form of statement"); 5 C. Wright & A. Miller, § 1215, p. 172 (3d ed. 2002) (Rule 8(a)(2) "indicates that a basic objective of the rules is to avoid civil cases turning on technicalities")

*Johnson v. City of Shelby*, 135 S. Ct. 346, 346-47 (2014) (per curiam). "The test for dismissal is a rigorous one and if there is any foundation of plausibility to the claim, federal jurisdiction exists." 13D Wright & Miller Federal Practice and Procedure § 3564, pp. 244–45 (3d ed.). In the event this Court finds that Kelley's Complaint is insufficient to survive ISU's motion to dismiss in whole or in part, Kelley asks this court for leave to amend her Complaint as there would be no prejudice to the Defendant at this stage in litigation from any such amendments.

## ARGUMENT

I.   **Kelley's Complaint Plausibly States a Claim Under Title IX for Retaliation**

   A.   **Title IX Prohibits Retaliation for Advocacy, Opposition, and Participation**

In *Jackson v. Birmingham Board of Education*, the U.S. Supreme Court determined that Title IX has an implied cause of action for retaliation. 544 U.S. 167, 171 (2005). The Court rejected the argument that Title IX did not support a cause of action for retaliation because it was not expressly written in the statute. *Id.* at 173–74. The Court reasoned that Title IX had such broad language that it encompassed a prohibition against retaliation. *Id.* at 175. The Court held that "when a funding recipient retaliates against a person because he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Id.* at 174. The *Jackson* Court explained that "retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination." *Id.*

The Court discussed in detail that a Title IX private right of action extends to claims of retaliation against a high school employee who complained of discrimination on the basis of sex on behalf of student athletes he coached. *Id.* at 179. The Court explained that because Title IX is broad it does not require that the victim of the retaliation must also be the victim of the discrimination. *Id.* (citing *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969) (holding

a general prohibition on racial discrimination under 42 U.S.C. § 1982 covers retaliation against those who advocate the rights of groups protected by that prohibition). Furthermore, the Court held that Title IX retaliation protection extends to the person if they can show that they were being punished for trying to vindicate the rights of another. *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 562-63 (3d Cir. 2017) (citing *Jackson at* 180 ("If funding recipients were permitted to retaliate freely, … individuals who witness sex discrimination would be loath to report it and all manner of Title IX violations might go unremedied.") (internal citations and quotations omitted)).

Educational institutions that received federal funding must agree to comply with Title IX *and* the DOE Title IX regulations as a condition precedent to receiving federal funds. 2011 Guidance, pp. 3-4 (citing 34 C.F.R. § 106.4 "Assurance required").[1] Title IX regulations "spell out prohibitions against sex discrimination" including but not limited to regulations covering differential treatment of students based on gender or aiding or perpetuating discrimination. 2001 Guidance, p. 3 (citing 34 C.F.R. § 106.31(a)-(b)). Additionally, Title IX makes it unlawful to retaliate against individuals, including Title IX Coordinators like Kelley, when they participate in a Title IX investigation, hearing, or proceeding or advocate for others' Title IX rights. *See* 34 C.F.R. § 106.71 (incorporating by reference 34 C.F.R. § 100.7(e) ("No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by [Title IX], or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing)). The 2001 Guidance was revised in light of Supreme Court cases addressing sexual harassment in

---

[1] Dept. of Education, Office for Civil Rights, Revised Sexual Harassment Guidance, January 2001 available at https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html (discussing Title IX regulations).

educational institutions. The 2001 Guidance "focuses on a school's fundamental compliance responsibilities under Title IX and the Title IX regulations …[and] describes the regulatory basis for a school's compliance responsibilities under Title IX…and provides information about actions that schools should take to prevent sexual harassment or to address it effectively if it does occur." 2001 Guidance, p. 2. The guidance outlines a prompt, effective remedial recipient response including the requirement to respond to instances of retaliation against students who report sexual harassment and to prohibit retaliation against those who complain on behalf of students. *Id*. at p. 17; (Complaint ¶¶ 49, 87-92, 93-94, 105, 108).

Even the September 2017 DOE Guidance cited by ISU echoes withdrawn guidance and the 2001 Guidance in identifying the Title IX Coordinator as responsible for managing interim measures and reiterates that investigations must be impartial and conducted by a person free from conflicts of interest:

> *Interim measures should be individualized and appropriate based on the information gathered by the Title IX Coordinator, making every effort to avoid depriving any student of her or his education. The measures needed by each student may change over time, and the Title IX Coordinator should communicate with each student throughout the investigation to ensure that any interim measures are necessary and effective based on the students' evolving needs.*
>
> *[…]*
>
> *A person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on*

*behalf of the school. Schools should ensure that institutional*

*interests do not interfere with the impartiality of the investigation.*[2]

ISU draws inferences in its favor to argue that Kelley did not engage in protected activity. (Def. Brief p. 17). However, this is a fact question which must be taken in the light most favorable to Kelley. This argument is improper because the question of whether Kelley engaged in protected activity is premature and not appropriate for a 12(b)(6) motion. ISU is attempting to conflate the requirement to plead a prima facie case with the requirement that plaintiff prove ultimate issues at later stages of this litigation. *Johnson v. Arkansas State Police*, 10 F.3d 547, 551 (8th Cir. 1993) (citing *St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502, 506 (1993); *United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 713–15 (1983) (distinguishing between the prima facie case and the ultimate issue in a Title VII case)). At this stage, ISU has been put on sufficient notice of the claims.

ISU relies on cases interpreting the "manager rule." (Def. Brief p. 18). To the extent that this Court finds it appropriate to analyze the facts of this case using the manager rule, the ISU's argument still fails.

### B.  Title VII's "Manager Rule" Does not Apply or Fails When Applied

The "manager rule" developed in a Tenth Circuit FLSA case. *McKenzie v. Renberg's, Inc.*, 94 F.3d 1478, 1486 (10th Cir. 1996) cert. denied *McKenzie v. Renberg's, Inc.*, 520 U.S. 1186 (1997). McKenzie was a former personnel director that discussed concerns regarding payment of overtime with two of her supervisors on separate occasions and then was fired. *Id.* at 1481. On

---

[2] Available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf?utm_name=.

appeal the Tenth Circuit granted judgment as a matter of law for the defendant and created the manager rule. *Id*. at 1486. The court held that to garner protection under FLSA anti-retaliation provision, the plaintiff must show "the assertion of statutory rights (*i.e.*, the *advocacy* of rights) by taking some action adverse to the company—whether via formal complaint, providing testimony in an FLSA proceeding, complaining to superiors about inadequate pay, or otherwise…" *Id.* at 1486.   The manager rule contemplates requiring more than mere discussion of compliance concerns and requires a plaintiff to "step outside his or her role of representing the company." *Id*. at 1486-87.

The Eighth Circuit discussed the manager rule in the context of a Title VII case, *EEOC v. HBE Corp.*, 135 F.3d 543 (8th Cir. 1998). In *EEOC v. HBE Corp.*, the Court discussed the general applicability of the manager rule and found that the plaintiff had properly "stepped outside" his human resources role when he refused to obey what he reasonably perceived to be a racially discriminatory directive to terminate an employee. *Id.* The Eighth Circuit distinguished that plaintiff's conduct from the conduct in *McKenzie* and found that "[u]nlike the plaintiff in *McKenzie* who merely alerted management of potential violations of the law in order to avoid liability for the company, [Plaintiff] refused to implement a discriminatory company policy. This placed him outside the normal managerial role which is to further company policy." *Id*. at 554.

ISU relies on *Skare v. Extendicare Health Servs., Inc.* and *Atkinson v. Lafayette College* to argue that Kelley did not engage in protected activity. 515 F.3d 836, 841 (8thCir. 2008); 653 F. Supp. 2d 581, 584 (E.D. Pa. 2009). These cases are inapposite to the facts of this matter.

Skare was a nursing home director whose job duties required her to ensure compliance. 515 F.3d at 841. The district court granted summary judgment for the employer and found that Skare had failed to make a formal complaint, failed to submit a written complaint, and that she

only made complaints in the course of her ordinary job duties and not for the "purpose of exposing an illegality." *Id*. at 840. The Eighth Circuit affirmed summary judgment and found that while there was no requirement for Skare to have made a formal written complaint, the Court still found that Skare's internal reports were insufficient to reach the level of protected conduct. *Id*. at 841. In support of the finding the Court explained that "Skare did not present facts showing that she had disobeyed any employer order…" thus failing to establish a prima facie case. *Id*.

ISU also relies on *Atkinson,* which was also decided at the summary judgment stage. 653 F. Supp. 2d at 596. Atkinson was an athletics director whose job duties included "ensuring compliance with Title IX." *Id.* at 584. Atkinson complained about gender inequities in athletics and made recommendations on Title IX issues within her department. *Id.* at 585. The plaintiff was fired in what she alleged was retaliation for advocacy. *Id*. at 595. However, the Court found that her complaints were merely made in the scope of what the college had hired her to do. *Id.* at 600.

This case is distinguishable from *Skare* and *Atkinson*. Unlike *Skare*, Kelley participated honestly and openly in an OCR investigation contrary to university counsel's directive and submitted a formal, written memo of compliance concerns she was not asked to submit as part of her job in addition to numerous other written and verbal complaints and advocacy. (Complaint ¶¶ 75, 77-81, 86-89). Unlike *Atkinson*, Kelley does not have a history of performance issues. 653 F. Supp. at 590-91. Unlike *Atkinson*, Kelley does not admit that any university administrator mostly supported her compliance efforts. *Id*. at 587, 599. Unlike *Atkinson*, Kelley does not concede anywhere in her complaint that her conflict with ISU administrators had to do with anything other than Title IX. *Compare Id.* at 601 ("[Atkinson], on several occasions, concisely summarized the nature of this dispute with the College from May 1998 forward as involving not Title IX, but rather general funding concerns[.]") *with* Complaint.

ISU argues that it would be impossible to address underperformance of a Title IX Coordinator without giving rise to a Title IX claim. However, this argument ignores that Kelley received positive evaluations during her employment yet was viewed as adversarial to the college's interests by other administrators. *Compare* Complaint ¶¶ 48, 74, 70-73 *with Atkinson* 653 F. Supp. at 599 ("[Atkinson] never suggested that the College opposed her Title IX efforts. As such, her advocacy was not adverse to the College's interests, but rather was precisely what the College expected of her in order for it to avoid Title IX compliance issues."). Here, Kelley alleged that compliance was supposed to be a function of her job duties but that her supervisor told her that she was only to be "the face" of equal opportunity on campus. (Complaint ¶¶ 42, 49). Kelley alleges that this was because ISU wanted her to be seen but not heard. (Complaint ¶ 55). Kelley challenged Title IX compliance issues with President Leath, Associate Vice President Lackey, Counsel Paul Tanaka, Senior Vice President Thomas Hill, and other key administrators. (Complaint ¶¶ 63-66, 75, 77-78, 88-89, 91, 93-96, 98, 101). Kelley did so in a manner that caused administrators to describe her as "litigious" and as always "wearing her investigator hat". (Complaint ¶¶ 70-73). Kelley was described in a manner by her fellow administrators that raises an inference that they viewed her as stepping outside her role as EO Director and Title IX Coordinator. (Complaint ¶¶ 70-73). Thus, in the light most favorable to Kelley, she stepped outside of her role representing ISU enough so that administrators described her as such. Kelley also alleged that other administrators diverted students away from her office to bypass her office. (Complaint ¶¶ 58-59, 66, 73, 97). Unlike *Atkinson*, Kelley disagreed with Associate VP Lackey finding in favor of a female victim of sexual assault and Dean Anthony in granting interim measures for another female victim of sexual assault. (Complaint ¶¶ 87-89). Kelley escalated her concerns and turned in a compliance memo to her supervisor the Associate Vice President detailing ISU policies and

practices that were negatively impacting student rights under Title IX. (Complaint ¶¶ 77-81). This was advocacy of the rights of protected persons under Title IX, which itself is protected activity. In addition, a governmental civil rights investigation occurred on campus. (Complaint ¶¶ 86-89). University counsel interfered with witness testimony, including Kelley's. (Complaint ¶¶ 93-94). Kelley told her supervisor that she did not follow university counsel's directive to withhold information from the OCR investigator. (Complaint ¶ 96). Instead, she told her supervisor that she was forthright, shared her compliance concerns that she had previously complained to him and other administrators about. (Complaint ¶¶ 95-96). Kelley also told him that the OCR investigator told her she could file her own complaint against the university based on the information she had shared. (Complaint ¶ 96). *See Atkinson*, 653 F. Supp. at 599 (discussing actions that put college on notice that Title IX litigation was a "reasonable possibility"). This was not information Kelley was required to share with her supervisor in the scope of her duties but instead in the light most favorable to Kelley, she was indicating she could file an action adverse to her employer and at the very least that she had taken "a position adverse to [the university]." *McKenzie,* 520 U.S. at 1487; *EEOC v. HBE Corp.* 135 F.3d at 554. Thus, in the light most favorable to Kelley, she stepped out of her role representing the university when she did not follow university counsel's directive to withhold honest testimony from the OCR. (Complaint ¶ 96).

The type of protected conduct at stake is also a matter of great public importance. In foregoing the application of the manager rule against a plaintiff that served as a high-level affirmative action administrator at a university, the Sixth Circuit explained:

> Simply because the employer has placed an individual in the position of a high-level affirmative action officer and contracted with the individual to advocate on behalf of women and minorities

to insure equality in employment within the institution, does not thereby immunize the employer from being held liable for illegally discriminating against that individual for such advocacy.  To hold otherwise would allow an institution… discriminate or retaliate against the affirmative action official for his advocacy, thus sending a message to the official that he either remain silent or be 'punished.'

Said differently, an employer inclined to engage in invidious discrimination in the workplace could hire an affirmative action official in order to convey the false impression that the employer is interested in eliminating illegal discrimination from the workplace, and proceed to retaliate against the official secure in the knowledge that no legal claim could be lodged against the employer for its actions. Thus, to hold that a high-level affirmative action official cannot bring a Title VII claim for discrimination based upon his or her advocacy of women and minorities would be to invite stratagems designed to circumvent, and indeed, to violate law which was designed to serve "as a spur or catalyst to cause 'employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history... .

*Johnson v. University of Cincinnati*, 215 F.3d 561, 577 (6th Cir. 2000) (quoting *Kaiser Aluminum & Chem. Corp.,* 443 U.S. 193, 204 (1979) (quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405,

418 (1975)).” The court also made clear that it was a jury question whether the plaintiff was discriminated against for his ‘advocacy’ “irrespective of whether the advocacy was part of the official’s contractual duties.” *Id.* at 578.

The question of whether or not Kelley engaged in protected activity is a fact question. At this stage it is a fact question whether ISU’s decision to fire Kelley was motivated by Kelley just doing her job to comply with Title IX. At this stage it is a fact question whether ISU was motivated by Kelley acting outside the scope of her job duties by participating honestly in the OCR investigation in opposition to ISU administrators, acting in a manner perceived as adverse to ISU, by submitting her Compliance Memo outlining harm to students and instances of non-compliance, and other alleged instances of protected activity. At this stage it is unclear if ISU was motivated by one of these reasons, some of these reasons, or all of these reasons. Ultimately, Kelley has plausibly plead her retaliation claim based on several theories of ISU’s retaliatory motivations and ISU’s motion to dismiss should be denied in its entirety.

## C. Count II of Kelley’s Petition Plausibly States a Prima Facie Claim for Retaliation in Violation of Title IX.

To plead a prima facie case of retaliation, a plaintiff must allege that (1) she engaged in a protected activity; (2) the federally-funded recipient, here Iowa State University, took an adverse action against her; and (3) the adverse action was causally linked to the protected activity. *Clausen v. Nat’l Geographic Soc.,* 664 F. Supp. 2d 1038, 1047–48 (D.N.D. 2009), *aff’d sub nom. Clausen v. Nat’l Geographic Soc'y*, 378 F. App’x 595 (8th Cir. 2010) (citing *Thorn v. Amalgamated Transit Union,* 305 F.3d 826, 831 (8th Cir. 2002)).

Kelley was fired by her supervisor Associate Vice President & Chief of Staff Miles Lackey. (Complaint ¶¶ 40, 108). Kelley was fired by ISU because of her complaints opposing ISU’s

violations of the Title IX prohibition against sex discrimination on behalf of persons at Iowa State University. (Complaint ¶¶ 63-66, 74-75, 77-79, 86-89, 91, 93-96, 98, 101). Specifically, Kelley opposed ISU's administrators' decision-making regarding Title IX compliance as it harmed students, faculty and staff—herself included. *Id*. Kelley's injury (her termination and all resulting damages) is "fairly traceable" to ISU's conduct. Kelley alleged that she reported her opposition to administrators with authority to take corrective measures all of whom chose not to take corrective measures. Kelley alleged that ISU's failure to take corrective measures was making students vulnerable to additional harassment in violation of Title IX. (Complaint ¶¶ 60-63, 79, 80, 89, 92, 109, 122). *See Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999); "[A]n official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf [and had] actual knowledge of discrimination in the recipient's programs and fail[ed] adequately to respond" gives rise to an action for damages." *Roe v. St. Louis Univ.*, 746 F.3d 874, 882 (8th Cir. 2014) (citing *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 290 (1998)).

Kelley also alleged that she was fired after participating in a federal civil rights investigation on campus after being told by university counsel Paul Tanaka to not be honest in the investigation. The OCR investigator told her she could file her own OCR complaint based on Kelley's lack of independence and authority on campus and her compliance concerns. (Complaint ¶¶ 86, 93-96). Kelley told her supervisor Lackey what she told the OCR investigator and what the OCR investigator told her. (Complaint ¶ 96).  In the light most favorable to Kelley, had she followed General Counsel Tanaka's directive to deny knowledge during the OCR investigation— she would not have been fired. (Complaint ¶¶ 86, 93-96,134, 136, 137, 140-143, 149-153). Kelley has alleged sufficient facts of the causal connection between her protected complaints and her

termination. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 592 (8th Cir. 2009). Therefore, ISU's motion should be denied in its entirety.

### 1. *Title VII does Not Preempt Title IX*

Employees are protected under Title IX. The plain, unambiguous text of Title IX provides protections to "persons" not just students. *Doe*, 850 F.3d at 562-63 (rejecting preemption argument). Accordingly, regulations specific to employees were promulgated. *See* 34 C.F.R part 106, Subpart E; *see also N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 512 (1982) ("subpart E regulations promulgated in connection with Title IX are valid"); *Brine v. Univ. of Iowa*, 90 F.3d 271, 275-76 (8th Cir. 1996) (looking to 34 C.F.R. § 106.51 regulations to define Title IX claim in conjunction with statute). Current DOE guidance also interprets Title IX to cover employees. (Complaint ¶ 33) (citing Title IX Resource Guide, "Scope of Title IX," p. 1 stating "Title IX protects students, employees, applicants for admission and employment, and other persons from all forms of sex discrimination…").[3] The September 2017 DOE guidance cited by ISU also references employees. Extending protections to employees was a consideration during the legislative process.

> Title VI. . .   specifically excludes employment from coverage
> (except where the primary objective of the federal aid is to provide
> employment). There is no similar exemption for employment in the
> sex discrimination provisions relating to federally assisted education
> programs.

---

[3]   Available   at   https://www2.ed.gov/about/offices/list/ocr/docs/dcl-title-ix-coordinators-guide-201504.pdf

*N. Haven Bd. of Ed.*, 456 U.S. at 531 (citing 118 Cong. Rec. 24684, n. 1 (1972)).

ISU's comparison of Title VII's prohibition against sex discrimination and Title IX's prohibition against sex discrimination is inaccurate and inconsistent with the legislative history of the two statutes. *Id.* at 512 ("subpart E regulations promulgated in connection with Title IX are valid"). Regulations applying a statute's ban on discrimination, "if valid and reasonable, authoritatively construe the statute itself." *Alexander v. Sandoval*, 532 U.S. 275, 284 (2001) (construing Title VII implementing regulations). Congress's intent was to make the statutes co-extensive, and not mutually exclusive. See *Doe*, 850 F.3d at 552-555, 559-563 (discussing legislative history of Title IX and Title VII). The purposes of the two statutes are distinct, permitting a plaintiff to sue as an employee under both. *Id.* at 559-560 (relying on six Supreme Court cases in holding that Title VII's concurrent applicability does not bar a plaintiff's private causes of action under Title IX).

> Despite Title VII's range and its design as a comprehensive solution for the problem of invidious discrimination in employment, the aggrieved individual clearly is not deprived of other remedies he possesses and is not limited to Title VII in his search for relief. The legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes.

*Johnson v. Railway Exp. Agency, Inc.*, 421 U.S. 454, 459 (1975) (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48 (1974)).

The Court in *Winter v. Pennsylvania State University*, also discussed how the legislative history of Title IX and Title VII to find that Title IX is not preempted by employees seeking to

bring Title IX discrimination cases. 172 F. Supp. 3d 756, 775 (M.D. Pa. 2016). The *Winter* court also looked to Supreme Court analysis of Title VII's legislative history and went on to follow precedent set by other courts permitting plaintiffs to bring gender based employment claims under Title IX. *Id.* at 774-75 (collecting authorities).[4]

ISU's reliance on cases like *Lakoski v. James* 66 F.3d 751 (5th Cir. 1995); and *Waid v. Merrill Area Pub. Schs*., 91 F.3d 857, 861-62 (7th Cir. 1996) is misplaced. These cases ignore Supreme Court precedent and were decided long before *Jackson* and fail to consider relevant Supreme Court precedent available at the time. *Fox v. Pittsburg St. Univ.*, 257 F. Supp.3d 1112, 1120-21 (D. Kan. 2017); *see also Doe*, 850 F.3d at 563 (evaluating and rejecting the reasoning in *Lakoski* and *Waid*). To the extent they are inconsistent with the holding in *Jackson* they are overruled.

ISU acknowledges that *Jackson* provides for a cause of action for money damages for an employee. (Def. Brief, p. 16, ECF No. 7-1). Of the sixteen cases ISU cited in support of its

---

[4] *Ivan v. Kent State Univ.*, No. 94–4090, 1996 WL 422496, at *3 n. 10 (6th Cir. 1996) (overruling the district court's conclusion "that Title VII preempts an individual's private remedy under Title IX"); *Preston v. Commonwealth of Virginia ex rel. New River Cmty. Coll.*, 31 F.3d 203, 205–06 (4th Cir. 1994) ("An implied private right of action exists for enforcement of Title IX....[which] extends to employment discrimination on the basis of gender by educational institutions receiving federal funds.") (citation omitted); *Gupta v. Albright Coll.*, No. Civ–A–05–1921, 2006 WL 162977, at *3 (E.D.Pa. Jan. 19, 2006)  [(finding Title VII has not been held to preempt Title IX)]; *A.B. ex rel. C.D. v. Rhinebeck Cent. Sch. Dist.*, 224 F.R.D. 144, 153 (S.D. N.Y. 2004) ("Title IX was intended by Congress to function as an additional safeguard against gender-based discrimination in the context of federally funded education programs; notwithstanding the possibility of other available remedies, including without limitation those available under Title VII."); *Henschke v. N.Y. Hospital–Cornell Medical Center*, 821 F. Supp. 166, 171–73 (S.D. N.Y. 1993) (rejecting the defendants' argument that Title VII preempted Title IX and explaining that *Cannon*, *North Haven*, and *Franklin* read together stood for the proposition that Title IX was intended to "serve as an additional protection against gender-based discrimination in educational programs receiving federal funding regardless of the availability of a remedy under Title VII"); *Bowers v. Baylor Univ.*, 862 F. Supp. 142, 144–45 (W.D. Tex. 1994) (holding that a private cause of action for damages exists under Title IX for gender-based employment discrimination).

preemption argument many were decided before *Jackson* in 2005 and, of the ten decided post-*Jackson*, only four consider the controlling authority in *Jackson*. (Def. Brief II(A)(4), ECF No. 7-1). The four cases that consider *Jackson* recognize that claims predicated on the rights of students are not preempted by Title VII. *Vandiver v. Little Rock Sch. Dist.*, 2007 WL 2973463, *15 (E.D. Ark. Oct. 9, 2007); *Ludlow v. Nw. Univ.*, 125 F. Supp. 3d 783, 788 (N.D. Ill. 2015); *Tompkins v. Barker*, 2011 WL 3583413, *3–4 (M.D. Ala. July 26, 2011), report and recommendation adopted, No. 2:10-CV-1015-MEF, 2011 WL 3584306 (M.D. Ala. Aug. 15, 2011); *Torres v. Sch. Dist. of Manatee Cty., Fla.*, 2014 WL 4185364, *4–5 (M.D. Fla. Aug. 22, 2014). Even the *Vandiver* decision cited extensively by ISU recognizes that Title VII preempts only those claims that have "no connection to the rights of students." *Vandiver*, 2007 WL 2973463 at*15. By contrast, Kelley's claims in Count I and Count II are predicated on Kelley's efforts to protect the Title IX rights of students.

ISU attempts to distinguish this case from *Jackson*. ISU would like the Court to distinguish *Jackson* from the case at bar by arguing that *Jackson's* holding is limited to claims about "particular students" and does not include claims about systematic non-compliance with Title IX. (Def. Brief, p. 16). The authority cited in ISU's brief does not support this position. *See Vandiver*, 2007 WL 2973463, at *15 (distinguishing *Jackson* based on whether the claim had a connection to the rights of students). There is also similarly nothing in the *Jackson* decision distinguishing complaints of systematic non-compliance with complaints on behalf of particular students.  Even if it did, Kelley's efforts to ensure Title IX compliance included efforts on behalf of particular students. (Complaint ¶¶ 79, 87-89).

Thus, Title VII is not the exclusive remedy for the allegations plead by Kelley and Title VII does not preempt Title IX. Therefore, this Court should deny ISU's motion to dismiss in its entirety.

**II.     Count I of Kelley's Complaint Plausibly States Claim for Gender Discrimination in violation of Title IX**

Count I of Kelley's Complaint states a claim for a violation of Kelley's Title IX rights and the Title IX rights of students, faculty, and staff on the ISU campus through ISU's efforts to undermine Title IX enforcement mechanisms on the ISU campus, thereby creating a climate of institutionalized sex-based discrimination.

Title IX regulations require recipients to have at least one "designated employee" responsible for coordinating Title IX compliance. *See* 34 C.F.R. § 106.8(a) ("Each recipient *shall* designate…") (emphasis added). Title IX regulations are an authoritative interpretation of Title IX's requirements. *N. Haven Bd. of Ed.,* 456 U.S. at 512. Refusing to designate a Title IX coordinator in order to limit the effective enforcement of Title IX's bar against sex discrimination is sex discrimination and a violation of Title IX. *See Jackson*, 544 U.S. at 173–74 (finding that Title IX's prohibition against sex discrimination includes a prohibition against dismissing an employee because of their advocacy for the Title IX rights of others). ISU hired Kelley to be the Title IX Coordinator. (Complaint ¶ 11). Kelley was ISU's first permanent director of equal opportunity and her office was not adequately funded or staffed. (Complaint ¶¶ 42, 47(c)). Kelley was told to be "the face" of equal opportunity, however, Title IX required Kelley to facilitate *actual* compliance with the law "including any investigation of any complaint communicated to [ISU] alleging its noncompliance with this part or alleging any actions which would be prohibited by this part." 34 C.F.R. § 106.8(a). ISU wanted Kelley to be seen and not heard so they diverted

26

complaints away from her office, ignored her coordination of Title IX, her advocacy, and complaints thereby undermining enforcement of Title IX, which is sex discrimination. *Jackson*, 544 U.S. at 174. Undermining the Title IX coordinator is sex discrimination because it is an intentional response to the purpose of the job—to prevent and prohibit sex discrimination. *See id.* ("[R]etaliation is discrimination "on the basis of sex" because it is an intentional response to the nature of the complaint: an allegation of sex discrimination…. Likewise, a recipient's deliberate indifference to sexual harassment of a student by another student also squarely constitutes discrimination on the basis of sex") (internal quotation marks and citations omitted). Kelley plausibly plead that she was proximately harmed by ISU's engagement in sex discrimination through its efforts to undermine Title IX compliance—including by ultimately firing her for performing in good faith the duties assigned to her by regulation.

### A. Kelley Has Standing to Pursue Count I

ISU asserts that Kelley lacks standing to assert her Title IX sex discrimination claim (Count I) because she herself is not a victim of sexual assault. (Def. Brief p. 3). ISU argues that Article III's "cases and controversies" provision prohibits Kelley from pursuing claims based on the legal rights of others. ISU's argument is based on an artificial distinction between Ms. Kelley and those individuals who have suffered from the effects of sexual assaults on the ISU campus as a result of ISU's policies and practices which interfere with Title IX enforcement at ISU and institutionalize climate of sex-based discrimination. Kelley—like sexual assault victims and other victims of sex-based discrimination—has been harmed by the same practices of undermining Title IX enforcement on the ISU campus which have institutionalized a climate of sex-based discrimination. Differences in the nature of the injury sustained by each victim are irrelevant.

Regardless of any differences in injuries, Kelley has standing to challenge the ongoing practices that have harmed her and continue to harm students and employees on the ISU campus.

At the outset, ISU's characterization of this issue as an Article III standing issue is inappropriate. In order to have standing under Article III, only three things are required. A plaintiff must allege: (1) an injury in fact, (2) causation; and (3) redressability. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180 (2000). ISU's standing argument is not that Kelley has not been injured, or that her injury is not tied to ISU's conduct, or that her injury is not redressable.[5] Instead, ISU's argument in section I(A) of their brief is that Kelley was not harmed in the same way that victims of sexual assault were harmed and that she is therefore not permitted to litigate whether ISU's conduct constitutes a violation of Title IX vis-à-vis those sexual assault victims.

ISU's argument is actually premised on federal courts' *prudential* standing limitations, not based on any *constitutional* requirements. *See Kowalski v. Tesmer*, 543 U.S. 125, 128–29 (2004) (distinguishing Article III standing requirements and non-constitutional prudential limitation). Because they are prudential rather than constitutional, courts are not compelled to strictly adhere to these limitations when they do not serve the policy for which they were developed. *Craig v. Boren*, 429 U.S. 190, 193 (1976). Federal courts have long recognized a number of circumstances where adhering to these prudential limitations does not serve their underlying policy, therefore allowing the district court to ignore such prudential limitation. Once such circumstance is referred to as "jus tertii" or "third party standing." *Id.* at 194. The doctrine of third party standing developed to allow a party whose claims depend on a determination of the rights of a third party to litigate

---

[5] As discussed in section I(A)(1) below any argument to that effect would fail.

that third party's rights in a federal court so long as the litigant's personal interests make her "fully, or very nearly, as effective a proponent of the [third party's] right." *Singleton v. Wulff*, 428 U.S. 106, 115 (1976); *see e.g. Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017) (holding that child had standing to litigate his father's denial of equal protection of citizenship rights); *Powers v. Ohio*, 499 U.S. 400, 415 (1991) (holding that criminal defendant had third party standing to litigate the equal protection rights of a stricken juror); *Craig*, 429 U.S. at 193 (holding beer vender had standing to litigate the constitutional rights of his potential customers).

Third party standing requires the Kelley to satisfy the requirements of Article III standing and to additionally demonstrate that she "has a close relationship with the person who possesses the right" and that there is a hinderance to the [third party]'s ability to protect [her] own interests" *Kowalski v. Tesmer*, 543 U.S. at 129–30. Kelley alleged facts regarding the harm to female victims of assault caused by ISU compliance-undermining practices. Kelley can pursue claims based on the rights of female students at ISU who have been harmed by actions of the University which serve to conceal and foster a climate of institutionalized sex discrimination at ISU, since she too was directly harmed by these same actions.

### 1. *Kelley has Article III standing*

Kelley has plead facts showing she has Article III standing because she alleged facts showing1) she suffered an "injury in fact," 2) that a causal connection exists between her injury and the conduct complained of, and 3) the likelihood that her injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted). The allegations in Kelley's complaint are sufficient to invoke the authority of this Court to redress the harm she suffered as a result of ISU's acts and omissions.

### a. *Injury, Causation & Redressability*

To have Article III standing, the injury alleged by the plaintiff must be "concrete and particularized" and "actual or imminent" as opposed to merely "conjectural or hypothetical." *Id.* at 560 (citations and quotations omitted). *Id.* at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim.") (citation omitted).

Kelley was an employee of ISU. (Complaint ¶¶ 11-16). Kelley was personally and proximately injured when ISU fired her for working in good faith to fulfill her statutory responsibilities as Title IX Coordinator and for advocating for gender equity and opposing ISU's institutional practices of denying Title IX rights to students. (Complaint ¶¶ 98-99, 101, 105, 108). ISU's termination decision is sex discrimination in violation of Title IX. 34 C.F.R. 106.51(b)(2)–(3); *Brine*, 90 F.3d at 275-76 (looking to 34 C.F.R. part 106.51 regulations to define Title IX claim in conjunction with statute).

Kelley's injury (her termination) is "fairly traceable" to ISU's challenged actions. Kelley alleged that she was considered to have objectively good job performance but was fired after being criticized for being "too litigious," needing to "collaborate more," and always wearing her "investigator hat." (Complaint ¶¶ 70–74). Kelley reported to administrators with the authority to take corrective measures that ISU's policies and practices were undermining compliance with Title IX, all of whom chose not to take corrective measures. (Complaint ¶¶ 75). Kelley also alleged that she was fired after participating in a federal civil rights investigation on campus after being told by university counsel Paul Tanaka to not be honest or forthright in the investigation. (Complaint ¶¶ 93–96). An OCR investigator told Kelley she could file her own OCR complaint based on Kelley's lack of independence and authority on campus and her compliance concerns. (Complaint

¶¶ 86, 93-96). When Kelley told her supervisor, Lackey, what she told the OCR investigator and what the OCR investigator told her, Lackey fired her. (Complaint ¶¶ 40, 96, 108). In the light most favorable to Kelley, ISU's systematic campaign to limit the effective enforcement of Title IX lead to Kelley's losing her job, to her being dismissed on terms less favorable than those offered to male employees, and to instances of sexual discrimination against students. (Complaint ¶¶ 86, 93-96,134, 136, 137, 140-143, 149-153). Because Kelley has alleged sufficient facts to plausibly state a causal connection the motion to dismiss must be denied. *Braden*, 588 F.3d at 592. As a result of ISU's practices of undermining effective enforcement of Title IX's prohibition against sex discrimination, Kelley has suffered concrete and particularized loses in the form of lost wages and benefits, emotional distress, professional and personal embarrassment, humiliation, and loss of enjoyment of life. (Complaint ¶¶ 154). Kelley has sufficiently plead facts, when accepted as true, establish the Kelley has suffered a concrete and particularized injury.

The injury alleged by Kelley can be redressed by this Court through an award of damages and other relief. (Complaint ¶¶ 7, 126, 146, 154-161). Kelley's present and future loss of financial compensation and her emotional distress can be compensated through an award of money damages. *See Gilster v. Primebank*, 884 F. Supp. 2d 811, 846 (N.D. Iowa 2012) (affirming emotional distress award and compensatory damages award that included backpay, sick leave, paid vacation, and paid holidays on plaintiff's successful sexual harassment and retaliation claims).To fully return Kelley to her rightful position, equitable remedies are also necessary including either reinstatement or front pay to compensate Kelley for the loss of wages that she will continue to suffer into the future. *See Ogden v. Wax Works, Inc.*, 29 F. Supp. 2d 1003, 1007 (N.D. Iowa 1998). Equitable relief is also necessary to remedy ISU's ongoing policies and practices of deliberately undermining enforcement of Title IX on the ISU campus. *Fitzgerald v. Barnstable Sch. Comm.*,

555 U.S. 246, 255–56 (2009) ("In a suit brought pursuant to this private right, both injunctive relief and damages are available.").

### 2. *Kelley has a Close Relationship to Victims of ISU's Institutionalized Sex-Based Discrimination.*

Kelley is entitled to litigate the rights of and seek relief that will protect the rights of all persons at ISU (students and employees) who have been and are currently harmed by ISU policies and practices institutionalizing sex-based discrimination many or most of whom were likely unaware that ISU had denied them their Title IX rights through its deliberate efforts to undermine Title IX enforcement.

In discussing applicability of third party standing rules, The United States Supreme Court observed, "If the enjoyment of the [third party's] right is inextricably bound up with the activity the litigant wishes to pursue, the court at least can be sure that its construction of the right is not unnecessary." *Singleton*, 428 U.S. at 114–15. Here, the rights of students, faculty, and staff on the ISU campus to be free of sex discrimination are inexorably bound to the ability of ISU's Title IX coordinator to properly enforce Title IX protections. The Supreme Court has often recognized that a physician's relationship with his patients is sufficiently close to confer third party standing in cases involving medical rights of the patient. *Id.* at 115. The Supreme Court has often focused on the existence of an advocacy relationship between the litigant and the third-part in evaluating third-party standing. *Id.*; *see also Craig*, 49 U.S. at 195 ("[V]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to the market or function.").

As an administrator, Kelley was uniquely positioned to hear and observe ISU administrators create conflicts of interest to resolve Title IX complaints in favor of the university

to the detriment of student complainants, she heard and observed ISU administrators deny her the right to help students address the effects of sexual harassment, and she observed university counsel interfere with the right of ISU employees to provide honest and forthright interviews to a federal governmental agency investigation all in violation of Title IX. (Complaint ¶¶ 61-62, 87-89, 93–96). Federal courts consider if "the relationship between the litigant and the third party [is] such that the former is fully, or very nearly, as effective a proponent of the right as the latter." *Singleton*, 428 U.S. at 115. Because of her position, Kelley has unique knowledge about ISU's efforts to undermine Title IX enforcement and of their awareness of, and intentional indifference to, practices that concealed and fostered a climate of institutionalized sex discrimination. Individuals victims of ISU's deliberate indifference generally aren't in a position to pursue claims against ISU based on its deliberate indifference because they lack information about ISU's awareness of the institutional policies and practices that conceal and foster a climate of institutionalized sex discrimination. This knowledge gap makes it unlikely that such victims could state a claim against ISU that would at the pleading stage satisfy the deliberate indifference standard governing such claims. *See Davis ex. rel. LaShonda D. Educ.*, 526 U.S. at 650 (holding a school district can be held liable for student-on-student sexual harassment "only where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities").

Kelley's statutory obligation to prevent sex discrimination including addressing the effects of sexual harassment on campus creates an identity of interest for her and other victims of ISU's challenged policies and practices. Additionally, as an advocate for victims of sex discrimination on the ISU campus, Kelley had a close advocacy relationship with those victims for whom she investigated complaints. This close advocacy relationship is exactly the type that justifies third party standing. *See Singleton*, 428 U.S. at 115 (emphasizing the "confidential" or "advocate"

relationship in evaluating third party standing). Thus, the injuries Kelley has suffered as a result of ISU's sex-based discrimination satisfy both Article III standing requirements and all prudential limitations on standing imposed by federal courts.

### B. The claims asserted in Count I of Kelley's Complaint are not moot

ISU also challenges this court's subject matter jurisdiction of this case on the basis that Kelley's claims in Count I are moot because (1) Kelley is no longer an employee of ISU and (2) some of the guidance Kelley cites in her Petition has been withdrawn and re-issued.

Federal courts routinely award equitable relief to terminated employees. *See Briscoe v. Fred's Dollar Store, Inc.*, 24 F.3d 1026, 1027 (8th Cir. 1994) (affirming permanent injunctive relief to plaintiff whose termination was found to be racially discriminatory). By ISU's logic, no wrongfully terminated employee could ever sue their employer under any civil rights statue after termination and seek remedies.

As alleged, Kelley seeks injunctive relief to redress ongoing harms caused by ISU's practices. (Complaint ¶¶ 155–161); *See Roe v. Wade*, 410 U.S. 113, 113 (1973) (natural termination of Roe's pregnancy did not moot her suit litigation involving pregnancy is 'capable of repetition, yet evading review'), *holding modified on other grounds by Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833 (1992). After firing Kelley and causing her to suffer injuries including ongoing lost wages, benefits, and emotional distress, ISU replaced her with someone who had less education and experience. (Complaint ¶¶ 108, 112). An inference can be drawn that ISU replaced Ms. Kelley with someone with less education and experience in order to employ a Title IX Coordinator that would agree to be only "the face" of the Equal Opportunity and Title IX office as opposed to an effective advocate and investigator enforcing Title IX rights and thereby engaged in sex-based discrimination. (Complaint ¶¶ 112). The effect of this and other efforts to

undermine Title IX enforcement at ISU creates continuing harm which can be remedied through injunctive relief.

### 1. *The withdrawal of guidance cited in Kelley's Petition has no impact on this courts subject matter jurisdiction over Count I*

ISU's argument rests squarely on a mischaracterization of Kelley's claim. Kelley's claim is not premised on ISU's failure to comply with legal obligations imposed by the cited guidance. (Complaint ¶¶ 1-7). Rather, Kelley's claim is based squarely on ISU's failure to comply with the legal obligations imposed by Title IX and the regulations promulgated thereunder. Unlike the cited guidance, the regulations enacted by Congress have the full force and effect of law and ISU's violation of those regulations is something this court is empowered to remedy. *Alexander v. Sandoval*, 532 U.S. at 284  ("We do not doubt that regulations applying [a statute's] ban on intentional discrimination are covered by the cause of action to enforce that [statute]."). Rather than constituting the legal basis of Kelley's claims, the cited (and subsequently withdrawn) guidance provide context for the course of conduct that ISU engaged in. ISU's awareness of the guidance which echo the 2001 Guidance (which has not been withdrawn) is evidence that illustrates the knowledge that ISU had regarding Title IX enforcement. The guidance demonstrates that the actions ISU took to undermine the effective enforcement of Title IX were not based on ignorance but were part of an intentional effort to undermine counter-discrimination efforts on ISU's campus thereby discriminating against resulting victims of sex discrimination and harassment on the basis of their sex.

## III.    Count III: Kelley's Complaint Plausibly States Claim Under Title VII for Gender and Race Discrimination

To establish a prima facie case of Title VII discrimination, plaintiff must show that she 1) is an African American woman, 2) she was qualified to do her job, 3) she suffered an adverse employment action, 4) circumstances give rise to an inference of pretext. *Tyler v. Univ. of Arkansas Bd. of Trustees*, 628 F.3d 980, 990 (8th Cir. 2011) (citing *Lewis v Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1038 (8th Cir. 2010)) (internal citation omitted). A plaintiff can prove discrimination "because of" sex or "because of" race when either of those protected characteristics is "a motivating factor for any employment practice, even though other factors also motivated the practice." *Tyler*, 628 F.3d at 990 (citing 42 U.S.C. § 2000e–2(m)). The prima facie case creates a rebuttable presumption of discrimination. *Id*. Courts will then determine whether plaintiff can establish pretext and rebut the employers proffered legitimate non-discriminatory reason. *Id*. (citing *McCullough v. Univ. of Ark. for Med. Scis.,* 559 F.3d 855, 860–61 (8th Cir.2009)).

ISU's motion must be denied because Kelley has set forth sufficient facts that show her race and gender motivated the decision to terminate her. Kelley established a prima facie showing of discrimination because alleged she is an African American woman employed at all relevant times by ISU. (Complaint ¶¶ 11, 148). She was qualified to do her job and received positive evaluations. (Complaint ¶¶ 48, 106). Kelley was fired despite her objectively good performance. (Complaint ¶¶ 108, 137, 103). *Cox v. Infomax Office Systems, Inc.,* No. 4:07-cv-0457-JAJ, 2009 WL 124700, at *4 (S.D. Iowa Jan. 16, 2009) ("The question at the *prima facie* case level, however, is not whether the plaintiff performed to the employer's expectations but whether he was otherwise qualified for the position he held."). A reasonable inference can be drawn that Kelley was qualified given that she was replaced by someone with less education and experience. (Complaint ¶ 112). *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) ("qualifications evidence may suffice, at least in some circumstances, to show pretext.")

Kelley alleges ISU institutionalized sex based discrimination. (Complaint ¶¶ 143, 145, 147) *Cf. Miller-El v. Cockrell*, 537 U.S. 322, 347 (2003) ("the culture of the District Attorney's Office in the past was suffused with bias against African-Americans in jury selection. This evidence, of course, is relevant to the extent it casts doubt on the legitimacy of the motives underlying the State's actions in petitioner's case."). The natural symptoms of institutionalized sex-based discrimination are the very reasons Title IX was enacted to protect students and employees. (Complaint ¶¶ 5, 12, 37, 47(d), 49, 57, 59-60, 62, 63, 68, 79-80, 85, 97). Title VII also protects employees from the symptoms of institutionalized sex-based discrimination. See *Doe* at 559-560. As a result of ISU policies and practices that institutionalized sex-based discrimination, Kelley was also negatively affected in her employment in violation of Title VII. (Complaint ¶¶ 108, 137). Kelley was told she was hired to be "the face" of equal opportunity on campus, (Complaint ¶ 42) and alleges this was in part due to her gender and race. (Complaint ¶¶ 149-152). Kelley alleges she was treated differently than male and white colleagues and that she received discriminatory compensation on the basis of race and gender. (Complaint ¶¶ 149-153). For all reasons herein briefed, the ISU's motion should be denied in its entirety.

## REQUEST FOR ORAL ARGUMENT

**COMES NOW** Plaintiff and hereby requests that she be heard orally for this motion. The undersigned further notes that an associate of Newkirk Zwagerman PLC would like to be granted the opportunity to argue to the Court.

**WHEREFORE** the Court should Deny Defendant Iowa State University's motion to dismiss in its entirety or, in the alternative, grant Plaintiff Robinette Kelley leave to amend the pleadings in the interest of justice.

Respectfully Submitted,


NEWKIRK ZWAGERMAN, P.L.C.


___/s/Beatriz Mate-Kodjo_____

Thomas Newkirk AT0005791

tnewkirk@newkirklaw.com

Beatriz Mate-Kodjo AT0012331

bmate-kodjo@newkirklaw.com

521 E. Locust Street, Suite 300

Des Moines, IA 50309

Ph: (515) 883-2000

Fax: (515) 883-2004


ATTORNEYS FOR PLAINTIFF


Original Electronically Filed.

Copy Served On All Parties Of Record:

NATASHA N. WILSON

Assistant Attorney General

Hoover Building, Second Floor

Des Moines, Iowa 50319

PHONE: (515) 725-0501

FAX: (515) 281-7219

natasha.wilson@ag.iowa.gov


DEREK T. TEETER, Pro Hac Vice

HAYLEY E. HANSON, Pro Hac Vice

MICHAEL T. RAUPP, Pro Hac Vice


Husch Blackwell LLP

PHONE: (816) 983-8000

FAX: (816) 983-8080

derek.teeter@huschblackwell.com

hayley.hanson@huschblackwell.com

michael.raupp@huschblackwell.com


ATTORNEYS FOR DEFENDANT